In re J.E., A Minor and E.E., A Minor.

Appeal of R.E. and R.E.

Superior Court of Pennsylvania.

Argued Oct. 5, 1999.
Filed Jan. 27, 2000.

**2.** 18 Pa.C.S.A. § 1106 was revised in 1995. Section 1106(c)(3) is re-enacted verbatim in the revised § 1106(c)(ii).

John D. Reinhart, Allentown, for R.E. & E.E., appellants.

Daylin B. Leach, Allentown, for J.E. & E.E., appellees.

Carol D. Doup & Valerie S. Cammarene, Allentown, for participating party.

Before DEL SOLE, KELLY and HUDOCK, JJ.

HUDOCK, J.:

¶ 1 R.E. (Mother) and R.E. (Father) appeal from the final decree that terminated their parental rights with regard to their minor children, J.E. and E.E. (the children). We affirm.

¶ 2 The factual findings of the court below may be summarized as follows: E.E. was born on January 24, 1988, and J.E. was born on April 21, 1986. Mother is the natural parent of the children. Father is the putative parent of the children. Lehigh County Office of Children and Youth Services (CYS) initially became involved with the family in 1986, after receiving reports of truancy and behavior problems regarding the parties' oldest son.[1] At that time, mental health issues with

---

1. Mother and Father have four children, only two of which are the subject of the present appeal.

regard to Mother were identified. CYS later received referrals concerning the family in 1989, 1990, 1993, 1994 and ultimately in February of 1995. On February 23, 1995, the Allentown Police took emergency custody of E.E. and J.E. because of reports of domestic violence within the home.[2]

¶ 3 The children have been in the custody of CYS continuously since February 24, 1995. Numerous issues were identified at the time of placement. Specifically, the parties had been engaging in serious domestic altercations, and occasionally Father had been excluded from the home due to Protection from Abuse orders. Further, Mother's mental health status was creating havoc within the home.

¶ 4 At the adjudication hearing on March 9, 1995, and subsequently at the dispositional review hearings on September 5, 1995, December 4, 1995, October 10, 1996, May 31, 1996, December 10, 1996, September 30, 1997, and March 25, 1998, the court continued the placement goal in the case as "return to home." Initially, the court ordered Mother to undergo a psychological evaluation and follow through with all recommendations for services, participate in marital counseling with Father, visit with the children and cooperate fully with CYS. Mother was later ordered to attend and complete treatment at Haven House, as well as engage in mental health treatment through the Base Service Unit and follow through with any recommendations for treatment, including family therapy.

¶ 5 The court ordered that Father participate in services as well. Specifically, Father was to participate in and complete a parenting education class, undergo a drug and alcohol evaluation and follow through with all recommendations for services, participate in marital counseling with Mother, visit with the children and cooperate fully with CYS. Father was also ordered to attend and complete domestic violence counseling at Confront, as well as engage in family therapy.

¶ 6 Pursuant to the court's order, Mother was referred to Dr. Frank Dattilio, a clinical psychologist, for evaluation on May 26 and May 31, 1995. Dr. Dattilio found Mother to be guarded, defensive, histrionic, dependent, aggressive and volatile. According to Dr. Dattilio, Mother has a history of psychological illness, but possesses a tendency to deny her psychological problems. Mother suffers from a bipolar disorder that causes her to display sporadic behavior and emotions. Dr. Dattilio also expressed that Mother exhibits poor judgment and has difficulty applying her knowledge of parenting to real life situations. In addition, Dr. Dattilio found Mother to prioritize her own needs before those of her children.

¶ 7 On February 12 and February 18, 1998, Dr. Dattilio reevaluated Mother. He found that her condition had deteriorated since her initial evaluation in 1995. Dr. Dattilio found Mother to be belligerent, depressive, short-tempered, distrustful, immature and prone to volatile acting-out behaviors. He opined that Mother lacks in her parenting ability despite her attendance at parenting classes. In addition, Mother's preoccupation centers around the children returning home, as opposed to what specifically needs to change in the home environment. According to Dr. Dattilio, Mother's failure to see how her mental illness interferes with her parenting and ability to provide the necessary consistency and structure despite the services and medications offered, are of great concern. He also expressed concern about Mother's manipulation of the doses of medication she is prescribed because doing so destroys its efficacy. Finally, Dr. Dattilio explained that even if Mother took the appropriate medicines as recommended, there was no guarantee that her condition would ever improve.

2. This incident of domestic violence occurred after Mother returned home from the Allentown State Hospital. At that time, CYS also took custody of the parties' youngest son.

¶ 8 Father was also referred to Dr. Dattilio for evaluation on May 31 and June 7, 1995. Dr. Dattilio found Father to present a fairly healthy personality profile. He opined that Father struggles with frustration over Mother's mental condition and even holds some animosity and resentment over her illness. Overall, Dr. Dattilio found that based on the history of the family and in light of the circumstances, it was uncertain that the parties would ever be consistent and competent caregivers. Specifically, he opined that Mother's mental illness and Father's response thereto directly and adversely impact on their parenting abilities.

¶ 9 Pursuant to court order, the family was referred to Dr. Phillip J. Kinney, a psychologist, for family therapy sessions on December 10, 1996. The goal of these therapy sessions was reunification. This goal was to be achieved by increasing communication within the family, assisting the parents in feeling and displaying empathy and sympathy for the children, diminishing the anger that the children possess toward their family and improving parenting skills and attitudes. Dr. Kinney explained that the children are extremely scared of Mother's illness and of the domestic violence between Mother and Father. Dr. Kinney found that the unsupervised visitations with Mother and Father caused emotional damage and a worsening of the fear in the children. After approximately fifteen months, Dr. Kinney found that both Mother and Father had made little progress overall toward achieving the goal of reunification, and that the problems of anger, marital discord and mental illness continue to persist. More specifically, he explained that slight progress had been made up until the last five to six months of therapy, at which point a severe regression occurred. Ultimately, Dr. Kinney opined that reunifying the family was unachievable.

¶ 10 The parties also attended marital therapy sessions through CYS since September 28, 1995. The counselor, Richard Drabic, indicated that their marital relationship is plagued with negative forms of communication and escalating negative emotions. He further articulated Mother's inability to accept her mental illness and the necessity of managing the manifestations of the illness when they occur.

¶ 11 The children have attended individual counseling sessions through Valley Youth House since February 2, 1998. Their counselor, Melanie Himmelberger, explained that the children would manifest physiological symptoms such as hives, stomachaches and memory lapses, in response to their fear of returning to their parents' care. Based on the knowledge and information that she attained from these sessions, Himmelberger expressed the need for permanency in the children's lives.

¶ 12 On April 25, 1998, the court again reviewed the case and, at that time, changed the placement goal for the children to adoption. CYS had requested this change because, over the course of almost four years, the parties had only periodically engaged in the required services, and did not successfully reach or progress toward the goal of reunification. Specifically, in 1998, Mother attended psychiatric sessions and visits with the children pursuant to the court orders. However, the visits were disengaged and included verbal abuse, obscenities and odd statements by Mother toward the children. In total, there was a lack of positive interaction at the visits. Furthermore, Mother ceased attending the KidsPeace program in February of 1998, without successfully completing the program. In addition, Mother did not attend the partial hospitalization program at Haven House and continues to unilaterally change the dose of her medication. Father has only partially complied with the required services. He attended the appropriate parenting classes pursuant to the court orders. However, Father attended only three months of sessions at the anger management program (CALM), and failed to return to the CALM program as instructed by CYS. He also attended several weeks at the Confront program for

anger management, but again dropped out before its completion.

¶ 13 The trial court found that the children are developing well in foster care. They are on target developmentally and are exhibiting normal childhood behaviors. Both girls testified before the court below and expressed their desire to have the parental rights of Mother and Father terminated, as they are adamantly opposed to returning to the care of their parents. Presently the children are placed with the same foster family that has been identified as an adoptive resource.

¶ 14 CYS filed a petition seeking to terminate the parties' parental rights to the children on October 26, 1998. Following a hearing conducted on December 3, 1998, the court determined that CYS had proved by clear and convincing evidence grounds for terminating their parental rights. The court, therefore, entered a final decree terminating the parental rights of Mother and Father. This direct appeal followed.[3]

¶ 15 Mother and Father now raise the following issues:

A. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN FINDING THAT [CYS] HAD MET IT[S] BURDEN OF PROVING ALL OF THE ELEMENTS NECESSARY FOR TERMINATION OF PARENTAL RIGHTS BY CLEAR AND CONVINCING EVIDENCE?

B. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT FOUND THAT [CYS] HAD SHOWN, BY CLEAR AND CONVINCING EVIDENCE, THAT THE CONDITIONS WHICH LED TO THE REMOVAL OF THE CHILDREN CONTINUED TO EXIST AND THAT

[MOTHER AND FATHER] HAD NOT AND COULD NOT REMEDY THE SITUATIONS WHICH LED TO THE REMOVAL OF THE CHILDREN?

Brief of Mother and Father, at 3.

¶ 16 When reviewing a decree that involuntarily terminates parental rights, this Court is limited to determining whether the trial court's decision is supported by competent evidence. *In re Adoption of L.D.S.*, 445 Pa.Super. 393, 665 A.2d 840, 841 (1995). "If the decree is adequately supported by competent evidence, and the trial court's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the trial court terminating parental rights will not be disturbed on appeal." *In re the Adoption of B.G.S.*, 418 Pa.Super. 588, 614 A.2d 1161, 1166 (1992).

¶ 17 The termination of parental rights is governed by statute. *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793, 797 (1996). Before permitting termination, the trial court must be satisfied that the petitioner has established the required statutory elements by clear and convincing evidence. *In the Interest of Q.J.R.*, 444 Pa.Super. 460, 664 A.2d 164, 165 (1995). Clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing that the trier of fact may come to a clear conclusion, without hesitance, of the truth of the precise facts in issue. *In re the Adoption of Dale A., II*, 453 Pa.Super. 106, 683 A.2d 297, 299 (1996). Finally, "[p]ursuant to the express mandate of Section 2511(b), a court must give 'primary consideration to the [developmental, physical and emotional] needs and welfare of the child.'" *In the Matter of*

---

**3.** Rule 1.2 of the Supreme Court Orphans' Court Rules permits the Orphans' Courts of the several judicial districts to adopt local rules regulating practice and procedure as long as they are not inconsistent with any rule adopted by the Supreme Court. In addition, Rule 7.1 of the Supreme Court's Orphans' Court Rules states that "[e]xceptions shall be

filed at such place and time, shall be in such form, copies thereof served and disposition made thereof as local rules shall prescribe." *See also* Rule 15.1. As Lehigh County Local Rule 15.4–1(F)(2)(c) provides that all decrees of termination of parental rights in contested proceedings shall be final orders, the present appeal is properly before us.

*Adoption of Charles E.D.M., II,* 550 Pa. 595, 603, 708 A.2d 88, 92 (1998).

¶ 18 CYS filed the petition seeking to terminate the parties' parental rights based upon the following sections of the Pennsylvania statute, and the court below terminated their rights as to each ground:

### § 2511. Grounds for involuntary termination

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his [or her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8). Although the trial court found that CYS had met its burden of proof under each section quoted above, under the above section we need only concur with its decision as to any one subsection in order to affirm the termination of the parties' parental rights. CYS concedes that it did not prove grounds for termination under subsection 2511(a)(1). Our review of the record supports this conclusion. Nevertheless, the record also supports the trial court's conclusion that CYS presented clear and convincing evidence to support the termination of the parties' parental rights under the remaining three subsections.

¶ 19 In the present case, the children have been removed from the parties' care for almost four years. "[I]f a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, [CYS] has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In the Interest of Lilley,* 719 A.2d 327, 332 (Pa.Super.1998). Pamela Quear, a caseworker for CYS, testified as to the various services provided for both Mother and Father during the four-your period and the failure of either parent to complete them successfully. Thus, as CYS has demonstrated that it fulfilled its mandate, the parties' parental rights were properly terminated.

¶ 20 On appeal, the parties assert that their parenting problems have been resolved or are under control to the extent that the children would not be adversely affected. Our review of the record reveals that Father testified with regard to some

of the techniques he has learned from the programs offered, and Mother testified that she is now consulting her psychiatrist and taking her medication as recommended. Of course, whether this testimony of the parties established that the problems were resolved or under sufficient control involved a credibility determination by the trial court that cannot be disturbed on appeal. *In re the Adoption of B.G.S., supra.* We do note, however, that Dr. Dattilio testified that even with the proper administration of Mother's medication, the nature of her mental illness renders successful parenting problematic. In addition, the parties did not present any other witness, such as Mother's psychiatrist, to support their claims of recent progress toward their parenting goals. Nevertheless, even accepting their testimony, the parties' request at the evidentiary hearing that foster care continue while they continue to work on their parental deficiencies must yield to the best interests of the children. *See Lilley,* 719 A.2d at 335 (explaining that mother's solution of continued placement of son in foster care, where he has been for fourteen years, is unacceptable and totally disregards the best interest of the child). *See also In re the Adoption of Dale A., II,* 683 A.2d at 302 (citation omitted) (holding that parental rights may not be preserved by waiting for more suitable financial circumstance or convenient time for performance of parental duties and responsibilities).

 ¶ 21 Finally, the parties argue that the children "were allowed to control the process and prevent reunification when the factors which led to their original adjudication had been resolved or controlled." Brief of Mother and Father, at 11. In essence, they argue that the court "made its determination based on the stated wishes of the minors." *Id.* at 17. A review of the entire record belies this claim. During the testimony of each child, the trial court warned of the permanency of their request to have the parties' parental rights terminated, and received assurances that their decision was not motivated by a desire for a higher standard of living.

Even if the children's testimony was less than contrite, the consideration given their quest for permanency and stability in their lives was clearly proper. *See Lilley,* 719 A.2d at 331 (approving consideration of child's desire to bring certainty, permanency to his relationship with his foster parents).

¶ 22 In conclusion, we reject the arguments and issues presented by Mother and Father and find that the order of the trial court terminating their parental rights is supported by clear and convincing record evidence. We therefore affirm the decree that terminated the parental rights of Mother and Father with regard to the children at issue.

¶ 23 Decree affirmed.