J-S54033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: H.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M., MOTHER | : | No. 974 MDA 2020 |

Appeal from the Decree Entered June 24, 2020
In the Court of Common Pleas of Dauphin County Orphans' Court
at No(s):  24 AD 2020

| | | |
|---|---|---|
| IN THE INT. OF: S.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M., MOTHER | : | No. 975 MDA 2020 |

Appeal from the Decree Entered June 24, 2020
In the Court of Common Pleas of Dauphin County Orphans' Court
at No(s):  25-AD-2020

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 09, 2021**

S.M. ("Mother") appeals from the Decrees granting the Petitions filed by Dauphin County Social Services for Children and Youth (the "Agency") to involuntarily terminate her parental rights to her minor, dependent children, S.T. (a female born in August 2015), and H.T. (a female born in August 2016) (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A.

§ 2511(a)(2), (5), (8) and (b), and to change their permanency goals to adoption under the Juvenile Act, 42 Pa.C.S.A. § 6351.[1, 2]  We affirm.

The trial court ably set forth the factual background and procedural history in its Opinion, which we adopt as though fully set forth herein.  *See* Trial Court Opinion, 8/25/20, at 1-11.  Briefly, the Agency took the Children into its care and custody on July 16, 2018.  *Id.* at 2.  "The main conditions which led to placement were Mother's homelessness, which was connected to her mental health condition, drug use and lack of income."  *Id.* at 16.  The Agency provided Mother with services, and also provided her assistance with housing and mental health programs.  *Id.*

On May 1, 2020, the Agency filed the termination and goal change Petitions.  On June 3, 2020, the trial court held an evidentiary hearing.  The Agency presented the testimony of Agency caseworker Nicole Martin, who was assigned to the family, and Agency paralegal Kathryn Sherman.  N.T., 6/3/20, at 5, 7-8, 55.  Mother testified on her own behalf, and presented the testimony of Randi Matson ("Matson"), a program specialist with Samara:  Nurture and

---

[1] The trial court appointed Heather L. Paterno, Esquire, as the Children's guardian *ad litem* ("GAL"), and Sarah E. Hoffman, Esquire ("Attorney Hoffman"), as the Children's legal interests counsel, both of whom were present at the termination hearing.

[2] The trial court also terminated the parental rights of J.T., Jr., ("Father") and any unknown father to the Children.  Neither Father nor any unknown father has filed an appeal or a brief in this matter.  *See* Trial Court Opinion, 8/25/20, at 1.

Education for Parents ("Samara"). *Id.* at 60, 88. Attorney Hoffman presented the testimony of Agency caseworker Valerie Broody ("Broody"), who permanently assumed the case in April 2020. *Id.* at 100. The GAL cross-examined Broody. *Id.* at 103.

On June 24, 2020, the trial court entered Decrees terminating Mother's parental rights and changing Children's permanency goals to adoption. On July 23, 2020, Mother timely filed Notices of Appeal, along with Concise Statements, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 13, 2020, this Court, *sua sponte*, consolidated the appeals.

Mother raises the following issues for review:

I. Whether the [t]rial [c]ourt erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. [§] 2511(a)(2), where Mother presented evidence that she was able to provide essential parental care, control, and subsistence necessary for the child's physical and mental well-being because any conditions that lead [*sic*] to placement were remedied by Mother?

II. Whether the [t]rial [c]ourt erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. [§] 2511(a)(5), where Mother presented evidence that the conditions which led to the placement of the [Children] no longer exist?

III. Whether the [t]rial [c]ourt erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. [§] 2511(a)(8)[,] where Mother presented evidence that the conditions which led to the placement of the [Children] no longer exist?

J-S54033-20

Mother's Brief at 7.[3]

We will address Mother's claims together, as she does so in the Argument section of her brief. Mother argues that, contrary to the trial court's findings, she completed the service goals and objectives created for her by the Agency. *See id.* at 14-18. According to Mother, she satisfied the first goal (*i.e.*, cooperate and comply with the Agency) by attending all court hearings, signing all releases, and maintaining regular contact with the Agency. *Id.* at 14. Regarding the second goal (*i.e.*, demonstrate mental health stability), Mother claims that she obtained two mental health evaluations, and followed through with treatment. *Id.* at 14-15.

As to the third goal (*i.e.*, demonstrate understanding of Children's developmental and emotional needs), Mother argues that she has attended every appointment or visitation opportunity. *Id.* at 15-16. Mother points to Matson's testimony that Mother has a strong bond with Children; Mother engages with Children; and Matson did not observe any safety concerns during

---

[3] In her Concise Statement, Mother also claimed that the trial court erred and/or abused its discretion by finding that the evidence was sufficient to terminate her parental rights pursuant to 23 Pa.C.S.A. § 2511(b). However, a challenge under section 2511(b) does not appear in her Statement of Questions Involved, nor has she discussed the requirements of section 2511(b) in her brief. Thus, Mother has abandoned any challenge to the trial court's determination that termination is in Children's best interests. *See* Pa.R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Nevertheless, as we discuss *infra*, we would conclude that the Agency satisfied its burden with regard to section 2511(b).

their visits. *Id.* at 16. Further, Mother asserts that she was unable to complete all of her parenting classes because the class times conflicted with her work schedule. *Id.* at 17; *see also id.* (claiming that she "was forced into a situation where she had to choose between complying with [A]gency goal number four (4) regarding maintaining employment and a stable source of income/housing versus attending parenting classes and complying with [A]gency goal number three (3).").

Mother contends that she fully complied with the fourth goal (*i.e.*, demonstrate an ongoing ability to meet Children's basic needs). *Id.* at 17. Mother argues that she has appropriate housing in Harrisburg, Pennsylvania. *Id.* Mother acknowledges that she was unable to work her regular shift for a while due to COVID-19 restrictions, but states that she is once again working full time. *Id.* at 17-18.

Finally, Mother asserts that she resolved the fifth goal (*i.e.*, remain abstinent from illegal drugs):

> On May 21, 2020, Mother obtained her medical marijuana card[,] which was approved due to her diagnosis of bipolar disorder, post-traumatic stress disorder, and anxiety disorder. Mother has never used nor tested positive for any other drug except marijuana[,] and was only using marijuana to help her cope with her anxiety and post-traumatic stress. Mother's use of medical marijuana in no way impairs her ability to properly care for her minor [C]hildren.

*Id.* at 18.

In its Opinion, the trial court set forth our standard of review and the law concerning involuntary termination of parental rights under section 2511,

- 5 -

addressed Mother's claims, and concluded that they lack merit. **See** Trial Court Opinion, 8/25/20, at 11-18. Specifically, the trial court evaluated Mother's level of compliance with each of the goals established for Mother by the Agency. **See id.** at 11-13. The trial court acknowledged Martin's testimony that Mother had been compliant with her goal to cooperate and comply with the Agency; however, the court concluded that Mother was not compliant with any of the remaining objectives. **See id.**

Further, the trial court determined that the Agency had satisfied its burden with respect to section 2511(a)(2), (5), (8) and (b). **See id.** at 14-18. The trial court noted that Mother failed to (1) complete a parenting program, (2) address significant mental health problems, and (3) rectify the conditions leading to placement—homelessness, drug use, lack of income—despite being provided with assistance. **See id.** at 16-17.

Moreover, while acknowledging a bond between Mother and Children, the trial court concluded that termination of Mother's parental rights was in Children's best interests. **Id.** at 17-18. The trial court concluded that Children have a strong bond with their foster parents, and termination would provide the Children with permanency. **Id.**

The record supports the trial court's conclusions, and we discern no abuse of discretion or error of law in the trial court's legal conclusions. We affirm on the basis of the trial court's well-reasoned Opinion in rejecting

Mother's claims. ***See id.*** at 11-18. Accordingly, we affirm the Decrees terminating Mother's parental rights to Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/09/2021

IN THE INTEREST OF

H.T., A Minor ✓

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
: JUVENILE COURT DIVISION
: No. 24 AD 2020 ✓
:
: Appeal of S̶ ̶ ! M   974 MDA 2020
:

IN THE INTEREST OF

S.T., A Minor

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
: JUVENILE COURT DIVISION
: No. 25 AD 2020
:
: Appeal of S̲ ̲ ̲M̲ ̲ ; 975 MDA 2020

**August 25, 2020**

## MEMORANDUM OPINION

S̲ ̲ ̲M̲ ̲, natural mother of S.T. and H.T., appeals from this Court's Decrees dated June 23, 2020 and entered of record June 24, 2020, involuntarily terminating her parental rights as to both S.T. and H.T. This opinion is offered in support of those Decrees, pursuant to Pa.R.A.P. 1925(a).

## Background

On May 1, 2020, Dauphin County Social Services for Children and Youth (Agency), filed petitions under each docket listed above seeking to terminate the parental rights of Mother to S.T. (DOB 8/ /15) and H.T. (DOB 8/ /16). In addition, a Goal Change to Adoption was requested through Juvenile Court. At the same time, the Agency filed petitions for termination of the parental rights of natural Father J̲ ̲ ̲T̲ ̲, Jr. as well as for "Unknown Father." A hearing was held before this Court on all petitions, on June 3, 2020. At the conclusion of the hearing, this Court issued final Decrees terminating the parental rights of Father and Unknown Father. No appeals have been taken from the issuance of those Decrees. On June 23, 2020, this Court issued a Decree of Involuntary Termination of Parental Rights of Mother, under each docket as to each child, pursuant to Adoption Act Sections 2511(a)(2), (a)(5), (a)(8) and 2511(b). On July 23, 2020, Mother

1

filed notices of appeal to the Superior Court under each docket.

As alleged in the petitions for termination of Mother's parental rights[1] and substantiated by evidence presented at the hearing, both children were placed in the care and custody of the Agency on July 16, 2018, and have remained in placement continuously since that date, living together in the same foster home. Mother (DOB 8/_ '96) and Father were never married. Father was incarcerated at the time the petitions were filed. The children were adjudicated dependent, following a hearing on July 25, 2018.

The genesis of the children's current placement began on July 16, 2018, when S.T. was almost two three years old and H.T. almost two. That day, Father contacted the Agency to report that Mother "abandoned" the children with him three days earlier. (N.T. 8) An assessment found his home inadequate for the children. Father also had mental health issues and tested positive for THC, amphetamines and opiates. (Id.) The Agency also discovered he had an active PFA order against him prohibiting contact with S.T. and H.T. Mother placed the children with Father even though she had petitioned for the protection order against Father on behalf of the children. (N.T. 21)

Mother was contacted and indicated to the Agency she had nowhere for the children to stay and no resources since she had just been evicted. (N.T. 9) Prior to Mother giving the children to Father, Mother had never had stable housing with the children and they lived transiently with her. (N.T. 50) The Agency thus took the children into emergency protective care and custody. (N.T. 8) They were placed with foster parents D     and M:_   S    through the Bair Foundation, where they remain. A Shelter Care hearing on July 19, 2018 resulted in the children being placed in the Agency's temporary care and custody.

Mother testified that when she became homeless in July 2018, she contacted the Agency for help and it was the Agency, according to Mother, who contacted Father to see if

---

[1] The content of the TPR Petitions filed in each case against Mother is substantively identical.

2

he could take the children even though Mother claimed she told the Agency there was an active PFA against him. (N.T. 64-65)

As noted, the children were adjudicated dependent following a hearing July 25, 2018, and directed to remain in the Agency's legal care and physical custody. The court ordered that Father was to have no contact with the children pursuant to the PFA. The court further ordered that Mother and Father be referred for parenting classes, obtain psychological evaluations and follow all recommendations. Nicole Martin was assigned as Mother's Agency Caseworker and continued in that capacity through January 2020, when she went on maternity leave. Caseworker Valerie Broody took over for her after that point. (N.T. 100)

An initial family service permanency plan (Permanency Plan) was created August 16, 2018 and identified five goals or objectives for Mother to meet in order for the children to be returned to her care: (1) cooperate and comply with the Agency by attending all court hearings and meetings, signing all releases and forms requested and notifying the Agency of a change in address; (2) demonstrate mental health stability by obtaining a psychological evaluation through Hempfield Behavioral Health and following through with its recommendations; (3) demonstrate an understanding of the children's developmental and emotional needs by completing an approved parenting program and maintaining regular and positive contact with the children; (4) demonstrate an ongoing ability to meet her children's basic needs by obtaining and maintaining safe and appropriate housing and obtaining and maintaining employment or a legal form of income; and (5) remain abstinent from illegal drugs by completing a drug and alcohol evaluation, provide negative drug screens and follow through with evaluations and recommendations. (See N.T. 11-12, 23; Exhts. 9, 14) These goals were later court-ordered. (See N.T. Exbt. 14) Caseworker Martin provided Mother with a copy of the initial Permanency Plan and over the course of the case, also provided her updated Permanency Plans every six months, which apprised her of whether she was in compliance with the goals and objectives. (Id.)

On August 22, 2018, the Agency made a referral for Mother for parenting classes in Samara's Intensive Parenting Program, commencing September 2018. Mother attended and

3

completed only one out of sixteen classes. (N.T. 29) Mother failed to complete the classes despite Samara's continued recommendation that she participate due to the concerns they observed during visitation with her children. (N.T. 29, 40) Mother would later attend parenting classes with Samara again, but not until January of 2020. (N.T. 48-49, 53) The most recent report from Samara, as of the hearing date, was that Mother was still in Phase II of the four-phase parenting program. (N.T. 52)

Shortly after placement of the children in July 2018, supervised visitation was arranged at Samara between Mother and S.T. and H.T. twice a week. Mother began to visit the children, attending 123 appointments without missing any, until visits were suspended March 10, 2020 (discussed below). (N.T. 33, 89; see Exbt. 7) Caseworker Martin described Mother as attentive during visits and that she played with the children, though she noted the visits remained supervised because of Samara's parenting concerns including that "Mother wasn't consistently tending to their emotional needs, and there were some concerns about her ability to understand their developmental needs and capabilities." (N.T. 33, 40) Caseworker Martin testified that Samara reported problems with mother becoming dysregulated during visits including yelling at the children. They also noted her failure to respond appropriately when she was causing them pain while fixing their hair. (N.T. 52-53) Samara continued to recommend that Mother participate in parenting education for these reasons. (N.T. 40)

Randi Matson, a Samara program specialist, monitored most of Mother's supervised visits, which began September 12, 2018. (N.T. 88-89) She stated that Mother and the children greeted each other enthusiastically, with kisses and hugs. (N.T. 89) Mother would normally talk to them about their day and encouraged conversations. (N.T. 89-90) Mother was described as very engaged and the children enjoyed doing crafts and playing in a tumble room. (N.T. 90-91) Matson noted that Mother attended only a few parenting classes despite having always been encouraged by Samara to do so. (N.T. 99) According to Matson, Mother has been able to apply what she had learned from her classes to her visits and has always been respectful of staff. (N.T. 94, 95) She did observe Mother get impatient with the children including while doing their hair but otherwise had no safety concerns when Mother was with the children. (N.T. 93) Mother testified that she has

4

visited the children regularly even if it required she walk to or from Samara and that "I genuinely love my children." (N.T. 68-69)

In October 2018, Mother was able to obtain transitional housing through Brethren Housing Association. (N.T. 77; Exbt. 9 (7/23/19 Plan) p. 14)) At the first permanency review hearing, October 25, 2018, the children were ordered to remain dependent and in the Agency's care and custody. Mother was found to be moderately compliant with the Permanency Plan. Since Mother had tested positive for THC, she was ordered to provide one drug screen per week for THC levels. (See N.T. 77) Mother was ordered to obtain a drug and alcohol evaluation and follow all recommendations. On October 11, 2018, Mother completed a drug and alcohol evaluation and was not recommended for treatment absent further mental health evaluation. (Exbt. 9 (1/31/19 Plan) p. 18)

On October 29, 2018, Caseworker Martin referred Mother for reunification services through Pressley Ridge. Pressley Ridge offers a variety of intensive in-home services and Mother was assigned a family advocate as well as a family therapist to help her identify coping methods and set her up for services. (N.T. 26, 78)

On November 27, 2018, Mother underwent a psychological evaluation with Hempfield Behavioral Health. (N.T. 24; Exbt. 16) She was diagnosed with Bipolar Disorder, PTSD, Anxiety State, Alcohol Abuse, Cannabis Abuse and Borderline Intellectual Functioning. The evaluator, Dr. Howard Rosen, made a number recommendations including that Mother attend a partial day program so she could receive a comprehensive array of services including psychiatric counselling, medication monitoring, individual and group therapies, day structure and socialization. (N.T. 24-25; Exbt. 16) Dr. Rosen advised she be assigned a CMU case manager to complete an intake and access these needed services. (Exbt. 16) In addition to this, Dr. Rosen recommended that Mother obtain domestic violence support and education, dual diagnosis treatment, parent-child interaction therapy (PCIT), transitional housing, family group conference and continue supervised visitation with her children, continue random drug testing, comply with in-home reunification services, and continue Agency involvement to ensure successful completion of these recommendations. (N.T.

5

25; Exbt. 16) Shortly thereafter, the Agency arranged for a CMU case manager to be assigned to Mother's case and help her access all the recommended services.

Caseworker Martin testified that as of the date she completed working with Mother in January 2020, Mother had failed to abide by many of Dr. Rosen's recommendations including completion of the partial psychiatric day program and attendance at a domestic violence or court-ordered educational program, PCIT therapy and dual diagnosis therapy. (N.T. 25)

On December 21, 2018, Caseworker Martin mailed Mother the updated Permanency Plan and reminded her of the upcoming permanency review hearing. She advised Mother that "while you are making progress, you have not met goal 2, 3, or 5," and that Mother had nine months to show she can provide the children a safe and stable home. (Exbt. 14)

At the next permanency review hearing, January 31, 2019, the children were ordered to remain dependent and in the Agency's care and custody. Mother was found to be moderately compliant with the Permanency Plan.

Around March 2019, Mother began dual diagnosis treatment through PA Counseling. (N.T. 78; Exbt. 9 (7/23/19 Plan) p. 12) Mother would attend counseling there from about February through August 2019 and stopped, according to Mother, because she had to choose between counseling and paying her bills and going to work. (N.T. 66, 78) The team encouraged Mother to complete a psychiatric evaluation and discussed the issues created by her continued THC use. Pressley Ridge reported that it would not be able to transition the children to in-home visits until Mother was clean of illegal substances.

At the April 30, 2019, permanency review hearing, the children were ordered to remain dependent and in the Agency's care and custody. Mother's compliance was noted as moderate. (N.T. 80) At the time, Mother was still in Samara's Phase II parenting program. (N.T. 80) Also around the time of the hearing, Mother had become unemployed and began to pursue a GED, which she was able to attain in 2019. (N.T. 43, 66, 80)

6

On May 5, 2019, Mother was criminally charged with Unlawful Possession of Marijuana and Use/Possession of Drug Paraphernalia. (Exbt. 22) With regard to Mother's drug use, her caseworker testified that she has consistently used marijuana over the life of the case, as reflected by nine positive drug screens for THC between July 24, 2018 and November 20, 2019; she had only one negative drug screen during this period. (N.T. 21-22; Exbt. 20) Mother did obtain a medical marijuana card in May 2020. (N.T. 67)

On July 18, 2019, the Agency learned that Mother was unsuccessfully discharged from PA Counseling because she missed too many individual therapy sessions for intensive treatment. (N.T. 25, 27) Thereafter, Pressley Ridge assisted Mother with an intake appointment for counseling services through TW Ponessa.

At the July 23, 2019 permanency review hearing, the children were ordered to remain dependent and in the Agency's care and custody. Mother was found to be in minimal compliance with the permanency plan. The court ordered Mother to cooperate with TW Ponessa. It was also discussed at the hearing that Mother was about to lose BHA housing and was also failing to attend CMU meetings, which Mother claimed was because she was "unable to go," without offering further explanation. (N.T. 81) On July 31, 2019, Mother was discharged from transitional housing. She moved in with friends and family. Mother reported at this time that she applied for Social Security Income (SSI).

On August 19, 2019, Pressley Ridge unsuccessfully discharged Mother due to her failure to progress and noncompliance with her mental health treatment. (N.T. 28; Exbt. 19) The reasons for discharge were reflected in Pressley Ridge's closing summary, which Caseworker Martin testified about at the termination hearing:

> Throughout services, Mother would fail to attend scheduled sessions. She was placed on an attendance contract and still could not consistently attend sessions.... Mother would not take responsibility for her actions. She was observed displaying verbal aggression and making impulsive decisions even when she knew the consequences. Mother had verbalized wanting to have the children reside with their foster parents long term for months. Then, July

7

2019 it says: Found out the Agency would not approve subsidized permanent legal relationship.

'Mother l, during her involvement, was unsuccessfully discharged from PA Counseling and did not follow up with any of the recommendations. She was also discharged from Brethren Housing Association Transitional Program. At that time it was reported that she was not mentally stable and was going to admit herself into a psychiatric hospital. The family therapist had trouble getting in touch with Mother and continued to encourage her to get treatment, but Mother was not following through.

(N.T. 26-27 (quoting from Exbt. 19))

Mother testified that she had initially done well at Pressley Ridge and had tested negative for drugs three months straight, but that her caseworker failed to show those documents to the court. (N.T. 66) She claims that as a result, she went into depression and back to smoking marijuana. (N.T. 67)

On October 1, 2019, Mother began employment with Pastorante, and was still employed there as of the June 3, 2020 termination hearing. (N.T. 30) Prior to that, she has a sporadic employment history. (See Exbt. 16, p. 3; Exbt. 9 (1/31/19 Plan) p. 14) Caseworker Martin stated that when she last completed a budget with Mother, Mother did not have sufficient income to care for the children nor have appropriate housing. (N.T. 30)

On November 20, 2019, Mother failed to appear for a scheduled psychiatric evaluation with TW Ponessa even though both the Court and the Agency had urged her to continue mental health services with it. (N.T. 26) Mother had begun services with TW Ponessa in August 2019 and was no longer participating in outpatient counseling and psychiatric services with them by September 25, 2019. (N.T. 26-27)

At the November 25, 2019 permanency review hearing, the children were ordered to remain dependent and in the Agency's care and custody. Mother was found to be minimally compliant with the Permanency Plan. There was considerable discussion at this hearing about Mother's mental health and that she had stopped attending counseling in September 2019. (N.T.

8

81) She was asked by the hearing examiner to get another psychiatric evaluation with TW Ponessa, which she did not do. (N.T. 81-82) Instead, Mother claims she went to TeamCare in December 2019 and underwent a psychological evaluation.[2] (N.T. 82) She testified she was presently in counseling with TeamCare since November 2019. (N.T. 71)

At the time Caseworker Martin ended her assignment as Mother's caseworker in January 2020, she found Mother to have failed to comply with four of the five Permanency Plan goals or objectives, including (2) demonstrate mental health stability; (3) demonstrate an understanding of her children's developmental and emotional needs; (4) demonstrate and ongoing ability to meet her children's basic needs and (5) remain abstinent from illegal drugs. (See N.T. 23-30, 43) She found Mother in compliance with the first goal, that she cooperate with the Agency. (N.T. 23, 43-44) Caseworker Martin noted that Mother had not alleviated concerns that brought her children to care, primarily, her mental health and its effect on her ability to provide stable housing in order to meet their physical and emotional needs consistently. (N.T. 30)

At the February 25, 2020 permanency review hearing, the children were ordered to remain dependent and in the Agency's care and custody. Mother was found to be minimally compliant with the Permanency Plan. At this hearing, Mother had multiple outbursts in the presence of her children and fired her court appointed attorney. (N.T. 82-83) Just prior to this hearing, Mother had been asked to leave BHA due to marijuana use. (N.T. 83) Mother claimed that she has since found housing in Harrisburg as of January 2020 and has maintained employment since October 2019. (N.T. 70)

On March 9, 2020, the Guardian ad Litem for both children filed motions requesting

---

[2] Mother claimed that she signed a release for TeamCare to provide her evaluation to the Agency. The Agency denied ever receiving a December 2019 TeamCare evaluation. (N.T. 85) The last it heard, Mother failed to show for an evaluation at TeamCare in November 2019 and the Agency was unaware it had been rescheduled and was never so notified by TeamCare. (N.T. 85)

9

suspension of visitation between the children and Mother pending a psychological evaluation of H.T. (N.T. 33; Exbt. 7) The Motion asserted that H.T. in particular had been struggling emotionally, mentally and physically for several months and that there had been testimony offered at the February 25, 2020 permanency review hearing as to H.T.'s "aggressive and at times uncontrollable behavior at school, which escalates after visitation with Mother." (Exbt. 7) In addition, the children became upset at the hearing after witnessing Mother's outburst and S.T.'s behavior was starting to become an issue. (Id.) On March 10, 2020, this Court granted the motions and suspended visitation pending further order of court.

Throughout the life of this case, the Agency attempted repeatedly to find family resources for placement. Caseworker Martin contacted many relatives on both the maternal and paternal sides of the family to no avail. (N.T. 34-40) There was a family engagement meeting in July 2018 with Mother and Father at which only maternal grandmother attended, and which was abruptly ended due to a family dispute. (N.T. 35) Caseworker Martin also encouraged Mother to reach out to family but Mother failed to do so and according to Martin, Mother believed placement with the foster family was preferable to placement with relatives. (N.T. 37-39) Mother informed her in 2019 that she wanted to sign over her rights and have an open adoption with the foster parents. (N.T. 37)

Mother disputed that she has not helped with finding family resources. She claimed that just prior to March 5, 2020, she provided a list to Caseworker Martin's supervisor of family members who were interested in a family conference and who might be resources but claims the Agency never got back to her. (N.T. 61-63)

Since July of 2018, the children have been living in a pre-adoptive home with the same foster parents, whom the children refer to as "mom" and "dad." (N.T. 32) As of the hearing date, the Smiths had put the children to bed every night for the previous 22 months, and according to Caseworker Martin, the children look to them for comfort and care. (N.T. 32) Foster Parents have provided the only stable housing the children have ever had. (N.T. 50) Caseworker Broody, who visited the children at Foster Parents' home, testified that the children

10

are very energetic, happy, outgoing and appear very comfortable with Foster Parents, as well as with one other child who lives in the home. They appear normal and Caseworker Broody has no concerns with their placement. (N.T. 101)

The foster parents did contact the Agency around January 2020, informing it they were having great difficulty with the children's behaviors and gave the Agency 30-day notice that they wanted to cease being foster parents. (N.T. 46-47) They were having particular difficulty with H.T., who was having outbursts, destroying property, urinating on the carpet and dancing inappropriately. (N.T. 101-102) This behavior escalated in January 2020 and Caseworker Broody, as well as Foster Parents and daycare staff, believed it was connected to the children's visits with Mother. (N.T. 103) The Agency and Foster Parents agreed to undergo PCIT and also have the children evaluated. (N.T. 102) Caseworker Broody testified that most of the outbursts stopped after Mother's visitation was suspended. (N.T. 103) While Foster Parents quickly withdrew their 30-day notice after getting Agency support, Caseworker Martin testified that the fact they gave notice raised some concerns but that ultimately, she believed Foster Parents had shown a lot of commitment and was encouraged that they sought help when they did not know how to respond to the children's behaviors. (N.T. 46) She believed it was in the children's best interests to terminate Mother's parental rights and have the children remain with the foster parents. (N.T. 51)

As ordered by the Court, the service goals and objectives that were to be achieved by Mother, and her level of compliance, as reflected by the credible evidence recited above from the hearing on involuntary termination, were as follows:

**(1) Cooperate and comply with the Agency.**

According to Caseworker Martin, Mother has been compliant with this objective. Mother has maintained regular Agency contact throughout the life of the case and has been responsive to the Agency; Caseworker Martin described Mother as "extremely cooperative." (N.T. 23, 43) Mother has attended all hearings and meetings scheduled by the Agency and signed all release of information forms requested by the caseworker, and all visitations with the children. Mother

11

underwent a psychological evaluation with Hempfield Behavioral Health as requested by the Agency, completed in November 2018.

**(2) Demonstrate mental health stability.**

Mother has not been compliant with this objective. Mother's mental health (and related therapy) was a primary objective in this case. Mother was provided many resources and constantly encouraged to follow through with her mental health care but was nevertheless unsuccessfully discharged from PA Counseling, Pressley Ridge and TW Ponessa due to her failure to attend sessions and/or follow through with recommendations and treatment. Mother was in fact court-ordered to undergo a re-scheduled psychiatric evaluation at TW Ponessa in November 2019. She failed to appear for this appointment, even after its importance was stressed to her by the hearing examiner at her November 2019 permanency review hearing. In addition, Mother failed to complete many of the programs recommended by Dr. Rosen in his psychological evaluation including attendance at a partial day program, attendance at a domestic violence or court ordered educational program, PCIT therapy and dual diagnosis therapy.

**(3) Demonstrate an understanding of her children's developmental and emotional needs.**

Mother failed to be compliant with this service objective. Mother was court-ordered to complete an Agency approved parenting program. To date, Mother has not completed a parenting program. On August 22, 2018, the Agency made a referral for Mother to Samara, and Mother began parenting classes in September 2018. Mother completed one out of sixteen parenting sessions through Samara's Intensive Parenting Program. That was despite Samara's continued recommendation that she participate in their parenting classes due to the concerns they observed during visitation with her children. Mother also continued to demonstrate difficulty in responding to her children's emotional needs.

**(4) Demonstrate an ongoing ability to meet her children's basic needs.**

Mother has not been compliant with this service objective. She was unable to remain in

12

transitional housing through BHA due to her continued marijuana use. Mother has also had a somewhat sporadic employment history. Though her employment situation appeared to stabilize somewhat over the last half year or so prior to the termination hearing, the evidence presented was that she lacked sufficient resources to care for her children.

### (5) Remain abstinent from illegal drugs.

Mother has failed to abide by this objective. She has consistently used marijuana over the life of the case, as reflected in nine positive drug screens for THC between July 24, 2018 and November 20, 2019, during which she had only one negative drug screen. During this time, she was not legally permitted to used marijuana. On May 5, 2019, Mother was criminally charged with Unlawful Possession of Marijuana and Use/Possession of Drug Paraphernalia. As such, she has failed to demonstrate sobriety over the life of this case.

## Legal Discussion

In her Pa.R.A.P. 1925(b) statement of errors, Mother argues that the trial court erred and/or abused its discretion by finding that the evidence presented at the hearing was sufficient to terminate Mother's parental rights, pursuant to 23 Pa.C.S.A. §§ 2511(a)(2) (a)(5), (a)(8) and 2511(b).

## A. The Agency met its burden of proving that statutory grounds exist for termination of Mother's parental rights.

The standard of review governing the trial court's termination of parental rights is well settled:

> When reviewing an appeal from a decree terminating parental rights, [the Superior Court] is limited to determining whether the decision of the trial court is supported by competent evidence. See In re K.C.W., 456 Pa. Super.1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Id. Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same weight we would give to a jury verdict. See In re Child M., 452 Pa. Super. 230, 681 A.2d 793, 800 (1996). We must employ a broad comprehensive review of the record in order to determine whether

13

the trial court's decision is supported by competent evidence. See, In re Matsock, 416 Pa.Super. 520, 611 A.2d 737, 742 (1992).

In re C. S. 761 A.2d 1197, 1199 (Pa. Super. 2000).

The Agency, as the party seeking termination, bears the burden of establishing, by clear and convincing evidence that grounds exist for termination of parental rights. In re J.D.W.M., 810 A.2d 688, 690 (Pa. Super. 2002). The standard of clear and convincing evidence means "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." Matter of Sylvester, 555 A.2d 1202, 1203-1204 (Pa. 1989). The Agency met its burden of proof and that termination of Mother's parental rights was proper.

The record establishes by clear and convincing evidence that for an unreasonable time, Mother failed to remedy the conditions that led to placement despite the services and opportunities made readily available to her. The Court found termination of Mother's parental rights was warranted based upon the Adoption Act, 23 Pa.C.S. §2511(a)(2), (a)(5) and (a)(8), which provide:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child.

\*\*\*

14

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(2), (5) and (8). In deciding termination, the Agency need prove only one of the provisions to support the termination of parental rights. In re J.E., 745 A.2d 1250 (Pa. Super. 2000); see also, In re J.I.R., 808 A.2d 934, 940 n.6 (Pa. Super. 2002).

In considering whether the party seeking termination has satisfied these provisions, the Court considers that a parent has an affirmative duty to work towards the return of his or her children. In re Adoption of J.J., 511 Pa. 590, 602, 515 A.2d 883, 889 (Pa. Super. 1986). At a minimum, that "affirmative duty requires that the parent show a willingness to cooperate with [the Agency] to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." Id. In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled her obligations; the court must further measure the parent's performance in light of what would be expected of any individual under similar circumstances. Matter of M.L.W., 452 A.2d 1021, 1023-24 (Pa. 1982) (citations omitted). The Superior Court has explained:

> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated. There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> ***
>
> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

15

In re K.Z.S., 946 A.2d 753, 759 (Pa. Super. 2008).

As set forth in detail above, clear and convincing evidence establishes grounds for termination under 23 Pa.C.S.A. §§ 2511(a)(2), (5) and (8). Since shortly after placement in July 2018, Mother has failed to comply with service objectives critical to her ability to properly parent S.T. and H.T., although ample resources and opportunities were extended to her. The evidence established under (a)(2) that the children have been "without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." Most notably, despite being provided many resources and encouraged and/or directed to comply by the Agency and Court, Mother has failed to address her significant mental health problems as evidenced by her unsuccessful discharge from three programs. She has also failed to complete a parenting program in over 22 months without offering any valid reason therefor. The attendance was specifically directed to address problems in her ability to parent observed during supervised visits. Mother's failure to complete a parenting program for over 22 months stands in stark contrast with her regular attendance at the supervised visits. Mother offered no valid reasons for her failure to address these issues. As is noted below, "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parental responsibilities."

The evidence also established grounds for termination under (a)(5), that "the conditions which led to the ... placement of the child [for period of at least six months] continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(2). The main conditions which led to placement were Mother's homelessness, which was connected to her mental health condition, drug use and lack of income. 23 Pa.C.S.A. § 2511(a)(5). As is set forth above, she was provided services and assistance with housing and mental health programs, yet even so, these issues have not been remedied within a reasonable period of time. For the same reasons, the Agency sufficiently established grounds for termination under (a)(8); i.e. that "the conditions which led to the ... placement of the child [for period of at least 12 months] continue

16

to exist, and termination of the parental rights would serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8).

B. Best Interests Analysis (23 Pa.C.S.A. § 2511(b))

This Court finds that the developmental, physical and emotional needs and welfare of S.T. and H.T. are best served by termination of Mother's parental rights. Pursuant to Section 2511(b), a court must give "primary consideration to the [developmental, physical and emotional] needs and welfare of the child." In re J. E., 745 A.2d 1250, 1254-55 (Pa. Super. 2000) (citations omitted). The statute provides:

> Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6), or (8), the court shall not consider any efforts by the parent to remedy the condition described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Even were we to accept that Mother has made some progress, in relation to a children's need for permanency, the Superior Court stated,

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parental responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law which contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

In re I.J., 972 A.2d 5, 13 (Pa. Super. 2009) (internal citations omitted).

Termination of Mother's parental rights provides S.T. and H.T. the opportunity for permanency.

17

Finally, the Superior Court has stated that, while "Section 2511(b) does not explicitly require a bonding analysis, [case law provides that] analysis of the emotional bond, if any, between a parent and a child is a factor to be considered in determining the developmental, physical and emotional needs and welfare of the child under §2511(b)." In the Matter of K.K.R.-S., K.M.R., K.A.R., 958 A.2d 529, 533 (Pa. Super. 2008). The Superior Court has explained,

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent child bond, paying close attention to the effect of permanently severing the bond.

In re C.P., 901 A.2d 516, 520 (Pa. Super. 2006).

Mother here has visited with her children, in supervised circumstances, on a regular basis over the course of this case and the evidence indicated a bond between her and the children. Nevertheless, credible evidence was presented that Mother's visitations with her children were a factor in emotional problems they exhibited after her visits, with H.T. in particular. These problems subsided after visitations were suspended. While the Court is cognizant of Mother's bond, we will not subordinate the children's best interests and the stability they enjoy with their foster parents to the hope that Mother can someday overcome her obstacles. The substantial evidence presented reflected that the children are bonded with their foster parents who provide them a stable home and loving care.

Accordingly, this court issued Decrees on June 23, 2020, from which Mother has appealed.

| | |
|---|---|
| _____August 25, 2020_____ | _____ |
| Date | John J. McNally, III, Judge |

<u>Distribution:</u>

Fawn E. Kehler, Esq. P.O. Box 122 Etters, PA 17319 (for Appellant Moon)

Heather L. Paterno, Esq., P.O. Box 473, Hershey, PA 17033-0473 (Guardian ad Litem)

Natalie M. Burston, Esq., 1001 N 6th St., Harrisburg, PA 17102 (for Agency)

18

**FILED**

AUG **2 5** 2020

JEAN MARFIZO KING
REGISTER OF WILLS AND
CLERK OF THE ORPHANS' COURT