J-S23001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 753 EDA 2021 |

Appeal from the Decree Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000075-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 754 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000527-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 755 EDA 2021 |

Appeal from the Decree Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000076-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  | : |  |
|---|---|---|
| APPEAL OF:  D.M., SR., FATHER | : | |
| | : | |
| | : | No. 757 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000528-2019

| IN THE INTEREST OF:  D.S.M., A MINOR, a/k/a D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF:  D.M., SR., FATHER | : | |
| | : | |
| | : | No. 760 EDA 2021 |

Appeal from the Decree Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000077-2021

| IN THE INTEREST OF: D.S.M., A MINOR, a/k/a D.M., Jr., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF:  D.M., SR., FATHER | : | |
| | : | |
| | : | No. 762 EDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000529-2019

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

---

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

J-S23001-21

MEMORANDUM BY LAZARUS, J.:                    Filed: December 23, 2021

D.M., Sr. (Father) appeals from the permanency review orders changing the permanency goal from reunification to adoption pursuant to 42 Pa.C.S.A. § 6351, and the decrees involuntarily terminating his parental rights[1] to his three children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b).[2] Upon review, we find no abuse of discretion with respect to the change of goal orders and we agree with the trial court's finding that the Department of Human Services established by clear and convincing evidence that termination was in the children's best interests. We rely upon the trial court's opinion, authored by the Honorable Joseph L. Fernandes, to affirm the orders and decrees.

Father and G.T. (Mother)[3] are the parents of three minor children, D.D.M. (born 9/16), D.R.M. (born 3/15), and D.S.M. (born 5/14) (collectively, Children). Following is an abbreviated timeline of the procedural and factual history of this case:

**March 26, 2019**:   Department of Human Services] (DHS) became involved with this family when a General Protective

---

[1] This Court consolidated the appeals by order dated July 8, 2021. **See** Pa.R.A.P. 513.

[2] Father has filed separate notices of appeal for each order in compliance with the Pennsylvania Supreme Court's decision in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018). **See** Pa.R.A.P. 341(b). In **Walker**, the Court clarified that "the proper practice under Rule 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." **Id.** at 977. **See also In the Matter of M.P.**, 204 A.3d 976, 981 (Pa. Super. 2019).

[3] Mother's related appeals are docketed at 809 EDA 2021, and 813-817 EDA 2020. We have disposed of those appeals separately, at J.S23046/21.

- 3 -

Services (GPS) report alleged Children were being neglected by their parents; that the home was dirty, malodorous, in generally poor condition, in need of several repairs, had potentially illegal utility connections, was possibly being resided in illegally, and lacked appropriate sleeping arrangement and food; that Father smoked marijuana and sold the family's Supplemental Nutritional Assistance Program (SNAP) benefits to purchase drugs; that neither of the [p]arents paid rent; that Mother did not change [D.D.M.'s] diaper in a timely manner; that the Children did not attend day care; that [D.S.M.] had developmental delays and a possible speech impediment; that both Parents were unemployed; that Mother received Department of Public Welfare (DPW) benefits; that Father suffered from untreated bipolar disorder; that two additional adults resided in the home; and that the family required a higher level of care than community-based Family Empowerment Services (FES) could provide.  The report was determined to be valid.

**March 28, 2019**:  DHS visited the home and observed that: exterior of home was in poor condition; a first-floor window was covered with plywood; front door did not have an operable lock; ceiling was leaking and unstable; leak had caused water damage to the walls; there was a hole in the floor; a rear window had a broken glass pane filled with clothing; the refrigerator was covered in mold, contained no food, and was inoperable; only 3-4 cans of food sat in the kitchen cabinets; the kitchen sink had no water connection; Children slept on old cushions on the floor; and home was cluttered with trash, clothing, and animal feces.  DHS informed Mother that the home was not appropriate for Children and asked if there were any family resources who could care for them while repairs were completed.  Father arrived home, became irate, and verbally threatened DHS.  Father attempted to enter DHS's vehicle but was restrained by neighbors.  DHS contacted the Philadelphia Police, who were dispatched to the home.  Children's Paternal Grandmother arrived at the home and stated she would be able to temporarily care for the Children, but that they could not stay on an extended basis because she lived in a senior living facility.  DHS developed a one-night safety plan for the Children, where they would reside with Paternal Grandmother.

**March 29, 2019**: DHS investigated other family members for possible kinship placement and ultimately determined a Family Friend as a possible resource. Family Friend's home, upon investigation, had all operable utilities, ample space and food, and appropriate sleeping arrangements for each of the Children.

Family Friend was willing and able to care for Children. DHS completed criminal and ChildLine clearances for Family Friend and household members and obtained an Order of Protective Custody (OPC) for Children and placed them with Family Friend.

**April 1, 2019**: Court held shelter care hearing. Father referred to Behavioral Health Service (BHS) for consult/evaluation.

**April 9, 2019**: Court held adjudicatory hearing. Father attended. Children adjudicated dependent based on present inability to provide proper parental care and control and committed to DHS custody. Father was referred to Achieving Reunification Center (ARC) for services, including housing. Visitation changed to allow for visitation in the kinship home, supervised by Family Friend.

**May 10, 2019**: Community Umbrella Agency (CUA) held initial single case plan (SCP) meeting, listing each child's goal as reunification with parents. Father's objectives were to comply with the needed services and court orders, comply with ARC for parenting education, housing assistance, and employment services, attend supervised visitation with Children, comply with BHS mental health evaluation and recommendations, and comply with anger management and domestic violence services. Father did not participate in the meeting.

**June 26, 2019**: Court held review hearing. Father did not attend. Children to remain in kinship care.

**July 30, 2019**: Court held permanency review hearing. Father did not attend. Court determined Father had not been attending ARC, nor had he attended BHS evaluation. DHS again referred Father to ARC and BHS, as well as to the Clinical Evaluation Unit (CEU) for immediate assessment. Supervised visitation continued, with CUA supervising once per month.

**August 8, 2019:** Father underwent psychological evaluation, which indicated Father presented as mistrustful, irritable, and uncooperative. He refused to provide pertinent information, including mental health history, where he slept, the disability for which he received SSI, or information about his older children (who are not subjects of this appeal). The report indicated Father did not meet diagnostic criteria for any specific disorder, but Intermittent Explosive Disorder could not be ruled out, and other diagnostic impressions included unspecified neurocognitive disorder, cannabis and tobacco use disorder, and homelessness. Recommendations included: complete parenting capacity

evaluation (PCE) to determine impact of neurocognitive dysfunction on parenting ability; complete CEU substance abuse assessment and comply with recommendations; complete neurological examination, and comply with DHS requests and recommendations, including anger management and parenting classes.

**October 22, 2019:** Court held permanency review hearing. Father did not attend. Father was ordered to engage ARC and undergo a PCE. Children remained committed to DHS custody and placement at Family Friend. Visitation changed to weekly, supervised visits at the agency.

**February 18, 2020**: Court held review hearing. Father did not attend. Commitment and placement remained. Court ordered a best interests guardian ad litem (GAL) for Children.[4]

**July 28, 2020**: Court held permanency review hearing. Father did not attend and was found minimally compliant with SCP. Children received trauma therapy and Elwyn services (behavioral health services). Father was referred to CEU for drug screen and assessment and was again ordered to complete PCE, and the court ordered CUA to assist Father with that and with application for medical assistance. Father was ordered to complete ARC workshops for housing, parenting and employment. Visitations were ordered supervised virtual due to the COVID-19 pandemic, to be changed to bi-weekly supervised two-hour visits when pandemic restrictions were limited. CUA was ordered to explore voluntary relinquishment with Father.

**December 15, 2020**: Court held permanency review hearing. Father attended. He was again found minimally compliant with his SCP and had made minimal progress toward alleviating circumstances necessitating Children's placement. Father and

_____

[4] The trial court appointed Lisa Visco, Esquire, as GAL and Terry Blynn, Esquire, as legal counsel for Children. **See** N.T. Termination Hearing, 3/26/21, at 4; **see also** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination[]of[]parental[]rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian ad litem representing the child's best interests can also represent the child's legal interests.").

Mother refused to disclose current address, Father failed to sign necessary paperwork to complete PCE, and Father did not complete ARC programs (parenting, education, employment services, or anger management counseling). Two of the Children were diagnosed with post-traumatic stress disorder (PTSD) and attention-deficit hyperactivity disorder (ADHD), one of whom was prescribed medication. Father was ordered to provide proof of employment or benefits received and was again referred to CEU for dual diagnosis assessment, monitoring, and three random drug screens. He was also ordered to sign necessary paperwork for the PCE and complete the evaluation as well as a neurological evaluation. Court appointed legal counsel for children. **See supra**, at n.3.

**January 6, 2021**: Two of the three children's permanency goals were changed to adoption, and the third child's alternate/concurrent goal was identified as adoption. Father's objectives included compliance with needed services and court orders; compliance with ARC for parenting, education, anger management, and employment services; attending supervised visitation/virtual visitation; compliance with DHS evaluation and recommendations; compliance with anger management and domestic violence services; signing consents and SCPs; compliance with PCE; attending neurological appointments; and, providing CUA with proof of income.

Trial Court Opinion, 5/20/21, at 2-6.

On March 26, 2021, the court held a goal change/termination hearing. Father and Mother were both present, with counsel, as were Children's guardian *ad litem* and legal counsel. Following the hearing, the court entered orders changing the goal to adoption for all Children and final decrees terminating Father's parental rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. Father timely filed the instant appeal. Both Father and the trial court complied with Pa.R.A.P. 1925. Father raises the following issues for our review:

1. Whether the trial court erred or abused its discretion when it involuntarily terminated Father's parental rights under the Adoption Act, 23 Pa.C.S.A. §§ 2511 (a)(2), (a)(5), and (a)(8)?

2. Whether the trial court erred or abused its discretion when it terminated Father's parental rights pursuant to section 2511(b), which requires the trial court to find that termination would best serve Children's physical and emotional needs and welfare?

3. Whether the trial court erred or abused its discretion when it changed the Children's goal to adoption and found reasonable efforts were made to reunify the family pursuant to 42 Pa.C.S.A. § 6351(f)(9) prior to changing the goal to adoption?

Appellant's Brief, at vii (reworded for ease of disposition).

Our standard of review in cases involving the termination of parental rights is well-settled:

[It] requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision [] should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). The termination of parental rights is governed by section 2511 of the Adoption Act, which requires a two-step analysis. First, the party seeking termination must prove by clear and convincing evidence that the parent's conduct meets at least one of the grounds for termination set forth in section 2511(a). *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).

- 8 -

Here, the court found termination was appropriate on the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (b) Other considerations. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).

This determination requires evidence "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1191, 1201 (Pa. Super. 2000) (en banc). Only if grounds for termination are established under subsection (a) does a court then determine whether termination would be in the best interest of the child, considering his or her developmental, physical, and emotional needs and welfare, pursuant to subsection (b). *See In re Adoption of S.P.*, 47 A.3d 817, 827-30 (Pa. 2012).

After our review, we conclude DHS proved by clear and convincing evidence that the statutory grounds for termination under section 2511(a)(2) were met.[5]

DHS obtained protective custody of Children in March of 2019 due to inadequate food and shelter, general safety concerns, and concerns about parents' substance abuse and mental health. CUA caseworker Tiffany Wilson testified there was no food in the house, and that there was mold in the refrigerator and in the sink. N.T. Goal Change/Termination Hearing, *supra* at

---

[5] We may affirm the court's termination order under any single subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004); *In re J.E.*, 745 A.2d 1250 (Pa. Super. 2000).

10. "It was a squatter house. There was a hole in the roof, so water was leaking in." *Id.* Wilson testified that Children, who ranged in age from four to six, were not up to date with medical or dental care and were not enrolled in school. *Id.* at 11. The Children have remained in DHS protective custody since March 2019 and were placed with Family Friend (foster parent). At the time of the termination hearing, Children had been with foster parent for approximately two years. *Id.* at 13.

CUA Caseworker Wilson testified that Children look to foster parent (who they refer to as "Mom-mom") to meet their basic needs, that they are safe, and that they have a healthy, parental bond with foster parent. *Id.* at 36-49. Additionally, she stressed that Children are thriving:

> I've been on the case since day one. I've met the children They could barely form sentences and that is – [D.S.M., the oldest child,] couldn't [] form a full sentence. [He] has conversations with me now. He pays attention in school. I mistakenly thought he was autistic because of this lack of communication[,] and I was wrong. I was gratefully wrong. But it was just the neglect. **The progress these children have made in [foster parent's] home, to me, is extraordinary**.

*Id.* at 50 (emphasis added).

Forensic Social Worker Roya Paller interviewed Children and testified that each of them "want their forever home to be [with] Mom-mom[.]" *Id.* at 101. Tito Valdez, City Solicitor, testified on behalf of DHS. Valdez emphasized that Children have been in DHS custody since March of 2019, but noted:

This is not a case where we're alleging or believe in any way that [Father] or [Mother] do not love their children. We believe sincerely that they do love them. But, unfortunately, there were a set of dependency issues that existed in March 2019, that have not sufficiently been addressed. At this juncture, the testimony from the social worker that's been on the case since the case opened, Your Honor, I believe – I would submit to the court was beyond credible, is that she would not be in a position to even recommend unsupervised visitation, let alone reunification, particularly given that we, [] still do not know where the parents reside. There are [] outstanding PCEs. And there has been some engagement since the last court date because there was a matter-of-fact conversation about voluntary relinquishments of parents rights. But at this juncture, the status of those objectives are pending because the parents chose not to engage in the services, since they've been ordered by this court and by—and recommended by CUA in the single case plan since the case opened. That's a choice they made. And, unfortunately, the dependency issues remain, and these children deserve permanency. They deserve stability. They deserve a parent and caregiver that understands that parenting isn't something that can be held in abeyance, and the beauty of this case is that they have that in [foster parent].

*Id.* at 105-06.

Under Section 2511(a)(2), it must be established that there has been repeated and continued incapacity, abuse, neglect, or refusal which has caused the child to be without essential parental care, control, or subsistence, and that the causes of this incapacity, abuse, neglect, or refusal cannot or will not be remedied. *In re Adoption of J.J.*, 515 A.2d 883, 889 (Pa. 1986). Here, the record evidence supported the conclusion that Father's behavior amounted to repeated and continued neglect of Children because, at the time of the hearing, Father still had not completed his PCE, nor had he disclosed to DHS the address of his residence for safety assessment. Moreover, we find

- 12 -

Father's argument that DHS "refus[ed] to allow [Father] the opportunity to complete the PCE prior to the termination hearing" both disingenuous and misguided. *See* Appellant's Brief, at 3. DHS recommended Father complete a PCE in August 2019. The court ordered Father to complete a PCE in October 2019, in July 2020, and again in December 2020. In January 2021, completion of the PCE was added to Father's SCP. It was only just prior to the hearing that Father signed the necessary paperwork to proceed with the PCE. *See J.J.*, **supra** at 889) ("At a minimum, th[e parent's] 'affirmative duty' [to work toward the child's return] requires that the parent show a willingness to cooperate with [the agency] to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood."). In July 2020, over a year after Children were adjudicated dependent, and in December 2020, Father was determined to be minimally compliant with his SCP and had made minimal progress toward alleviating the circumstances necessitating Children's placement. Father's belated efforts were insufficient to justify continued uncertainty for Children. When a child is placed in foster care, the parent has an affirmative duty to work toward the child's return. *In re Julissa O.*, 746 A.2d 1137, 1141 (Pa. Super. 2000). Moreover, this "affirmative duty," requires the parent to demonstrate willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities. *Id.* Consequently, we find no abuse of discretion in the court's determination to

terminate Father's parental rights to Children pursuant to subsection (a)(2). *See In re T.S.M.*, *supra*; *In re L.M.*, *supra*; 23 Pa.C.S.A. § 2511(a)(2).

Termination was also proper under section 2511(b) where: (1) evidence suggests Father's behavior during visitation was more "friendly" than "parental;" (2) CUA case manager testified Children would not suffer permanent or irreparable harm if Father's parental rights were terminated; (3) Children had no emotional reaction when visits with Father ended and, instead at the end of the last visit, Children ran to foster parent's car; (4) Children had developed healthy bonds with foster parent; and, (5) Children need permanency and stability in their lives. Trial Court Opinion, *supra* at 18-25; N.T. Goal Change/Termination Hearing, *supra* at 36-50, 101, 117. The court found that the evidence established that there was a bond between Children and foster parent, and that Father "has not created a healthy parental bond between himself and Children." Trial Court Opinion, *supra* at 24. The record supports this determination.

In his final issue, Father claims the court erred or abused its discretion in changing the permanency goals to adoption. Because we have concluded that the trial court did not abuse its discretion in granting the petition to terminate Father's parental rights, this issue is moot. *Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (*citing Interest of D.R.–W.*, 227 A.3d 905, 917 (Pa. Super. 2020)). *See also In re H.S.W.C.-B*, 836 A.2d 908, 911 (Pa. 2003) (holding that orders granting or denying goal changes, as well as orders terminating or preserving parental rights, are final and appealable

when entered and remain in effect until overturned on appeal, or rendered moot by a subsequent order).[6]

The parties are directed to attach a copy of Judge Fernandes' Rule 1925(a) opinion in the event of further proceedings in the matter.

Orders and decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/21

---

[6] Even if we were to address this issue, we would find no error or abuse of discretion. **In the Interest of L.T.**, 158 A.3d 1266, 1276 (Pa. Super. 2017). Here, the trial court correctly disposes of Father's claim with regard to changing the goals to adoption where: (1) Children have been in DHS care for two years; (2) DHS made reasonable efforts to identify, locate, work with, and provide services to Father to aide in the reunification process; (3) Father was uncooperative with DHS, particularly with respect to completing the PCE and disclosing to DHS his current address, which prevented CUA from assessing the home for potential reunification; (4) Father's progress toward his goals was "minimal" to "moderate" over two years, never progressing beyond supervised visits with Children; (5) the forensic social worker reported Children wanted to remain with their "Mom-mom;" and (6) Children are thriving in their foster home. **See** Trial Court Opinion, 5/20/21, at 21-24. Children are in a safe and stable environment and "have formed a positive and beneficial bond with their "Mom-mom." **Id.** at 24. The court emphasized that "Children need permanency, which Father cannot provide[,] nor has Father taken concrete steps to provide in the future." **Id.**

**IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION**

| | | |
|---|---|---|
| In the Interest of D.D.M., a Minor | : | CP-51-DP-0000527-2019 |
| a/k/a D.M., a Minor | : | CP-51-AP-0000075-2021 |
| | : | |
| In the Interest of D.R.M., a Minor | : | CP-51-DP-0000528-2019 |
| a/k/a D.M., a Minor | : | CP-51-AP-0000076-2021 |
| | : | |
| In the Interest of D.S.M., a Minor | : | CP-51-DP-0000529-2019 |
| a/k/a D.M. Jr., a Minor | : | CP-51-AP-0000077-2021 |
| | : | |
| | : | |
| | : | FID:   51-FN-000528-2019 |
| | : | |
| | : | |
| APPEAL OF: D.M. Sr., Father | : | 754 EDA 2021 |
| | : | 753 EDA 2021 |
| | : | 757 EDA 2021 |
| | : | 755 EDA 2021 |
| | : | 762 EDA 2021 |
| | : | 760 EDA 2021 |

**OPINION[1]**

**Fernandes, J.:**

Appellant D.M. ("Father") appeals from the orders entered on March 26, 2021 granting the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to D.D.M. ("Child 1"), D.R.M. ("Child 2"), and D.S.M. ("Child 3") (collectively "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b), and to change each Child's permanency goal from reunification to adoption, pursuant to 42 Pa.C.S.A. §6351. Deborah Fegan, Esquire, counsel for Father ("Father's Counsel") filed timely

---

[1] The trial court first requested the Notes of Testimony for March 26, 2021, on March 29, 2021. The trial court issued a second request for the Notes of Testimony on April 15, 2021. The trial court issued a third request for the Notes of Testimony on April 29, 2021. The Notes of Testimony for March 26, 2021 were received on April 30, 2021.

Notices of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) on April 19, 2021.

**Factual and Procedural Background:**

DHS initially became involved with this family on March 26, 2019, when a General Protective Services ("GPS") report alleged: that Children were being neglected by their parents; that the home was dirty, malodorous, in generally poor condition, in need of several repairs, had potentially illegal utility connections, was possibly being resided in illegally, and lacked appropriate sleeping arrangements and food; that Father smoked marijuana and sold the family's Supplemental Nutritional Assistance Program ("SNAP") benefits to purchase drugs; that neither of the Parents paid rent; that Mother did not change Child 1's diaper in a timely manner; that the Children did not attend day care; that Child 3 suffered from developmental delays and a possible speech impediment; that both Parents were unemployed; that Mother received Department of Public Welfare ("DPW") benefits; that Father suffered from untreated bipolar disorder; that two additional adults resided in the home; and that the family required a higher level of care than community-based Family Empowerment Services ("FES") could provide. The report was determined to be valid.

DHS visited the home on March 28, 2019. DHS observed: that the exterior of the home was in poor condition; that a first-floor window was covered with plywood; that the front door did not have an operable lock; that the ceiling was leaking and unstable; that the leak had caused water damage to the walls; that there was a hole in the floor; that a rear window had a broken glass pane filled with clothing; that the refrigerator was covered in mold, contained no food, and was inoperable; that only 3-4 cans of food sat in the kitchen cabinets; that the kitchen sink had no water connection; that the Children slept on old cushions on the floor; and that the home was cluttered with trash, clothing and animal feces. Mother informed DHS that the home's water registered high lead levels and that the Department of Licenses and Inspection had filed a lawsuit against the homeowner to make the appropriate repairs. DHS informed Mother that the home was not appropriate for Children and asked if there were any family resources who could care for them while repairs were completed. Father arrived home, became irate and verbally threatened DHS. Father attempted to enter DHS's vehicle but was restrained by neighbors. DHS contacted the

Philadelphia Police, who were dispatched to the home. Children's Paternal Grandmother arrived at the home and stated she would be able to temporarily care for the Children, but that they could not stay on an extended basis because she lived in a senior living facility. DHS developed a one-night safety plan for the Children, where they would reside with Paternal Grandmother.

On March 29, 2019, DHS investigated other family members for possible kinship placement. Children's adult Half-Sibling was not deemed an appropriate resource. Half-Sibling named a Family Friend as a possible resource. Family Friend's home, upon investigation, had all operable utilities, ample space and food, and appropriate sleeping arrangements for each of the Children. Family Friend was willing and able to care for Children. DHS completed criminal and ChildLine clearances for Family Friend and all household members. DHS obtained an Order of Protective Custody ("OPC") for Children and placed them with Family Friend.

On April 1, 2019, at the shelter care hearing, the court lifted the OPC and ordered Children's temporary commitment to DHS to stand. Father was referred to Behavioral Health System ("BHS") for consultations and/or evaluations. Visitation was ordered to be supervised by a male worker at the Agency.

On April 9, 2019, an adjudicatory hearing was held[2] for Children. Father attended this hearing. The court discharged the temporary commitment, and all three Children were adjudicated dependent based on present inability to provide proper parental care and control. Children were committed to the custody of DHS. Father was referred to the Achieving Reunification Center ("ARC") for appropriate services, including housing. Visitation was changed to allow for visitation in the kinship home, to be supervised by the caregiver, Family Friend.

On May 10, 2019, the Community Umbrella Agency ("CUA") held an initial single case plan ("SCP") meeting. Each Child's goal was listed as reunification with parents. Father's objectives were to comply with the needed services and court orders, comply with ARC for parenting education, housing assistance, and employment services, attend supervised visitation with Children, comply with the Behavioral Health Service ("BHS") mental health evaluation and

---

[2] Honorable Vincent W. Furlong oversaw this case between April 1, 2019, and February 18, 2020. Honorable Joseph L. Fernandes oversaw the case from July 28, 2020, until present.

recommendations, and comply with anger management and domestic violence services. Father did not participate in the meeting.

On June 26, 2019, the court held a review hearing. Father did not attend. Children were to remain in Family Friend's home, and the court found kinship care had been implemented.

On July 30, 2019, the court held a permanency review hearing. Father did not attend. The court found that Father had not been attending ARC, nor had he attended the ordered BHS evaluation. Father had visited the Children three times. Placement continued to be necessary and appropriate, so Children were ordered to remain as committed and placed. Father was again referred to ARC for appropriate services, and again referred to BHS for consultations and evaluations. Father was also referred to the Clinical Evaluation Unit ("CEU") for a forthwith assessment. Visitation remained as supervised in the kinship home, with CUA supervising once per month. CUA was also ordered to provide a report of the Children's lead levels at the next hearing.

Father participated in a psychological evaluation on August 8, 2019, to evaluate his current psychological functioning and determine whether any behavioral treatment needs existed. The evaluation stated that Father presented as mistrustful, irritable, and uncooperative. Father refused or was reluctant to provide pertinent information, including mental health history, information about the location he slept, the disability for which he received SSI, or information about his older children[3]. The report indicated Father did not fulfill the diagnostic criteria for any specific disorder at that time but given his history of impulsive verbal aggression and tendency to lash-out, Intermittent Explosive Disorder could not be ruled out. Other diagnostic impressions included unspecified neurocognitive disorder, cannabis use disorder, tobacco use disorder, homelessness, and problems related to legal circumstances – DHS involvement. The evaluation recommendations included: complete a parenting capacity evaluation ("PCE") to determine the impact of his neurocognitive dysfunction on parenting ability; complete a CEU substance abuse assessment and comply with recommendations, due to problematic cannabis use; complete a neurological examination to determine if further neurological testing would be beneficial; information about

---

[3] Father's older children are not involved in this appeal.

tobacco cessation programs; and, comply with all DHS requests and recommendations, such as anger management and parenting classes.

On October 22, 2019, the court held a permanency review hearing. Father did not attend. Father was ordered to engage ARC and undergo a PCE. Children were to remain as committed and placed. Visitation was changed to weekly supervised at the agency.

On February 18, 2020, the court held a review hearing. Father did not attend. Children were ordered to remain as committed and placed. The court also ordered a best interests Guardian ad Litem ("GAL") be appointed for the Children.

On July 28, 2020, the court held a permanency review hearing. Father did not attend this hearing. Father was found minimally compliant with his SCP. All Children received trauma therapy. Medication management was recommended for Child 2. Child 1 was diagnosed as being on the autism spectrum. All Children received Elwyn services. Father was referred to CEU to complete a forthwith drug screen and assessment. Father was again ordered to complete a PCE, and CUA was ordered to assist him. CUA was also ordered to assist Father with applying for medical assistance. Father was ordered to complete ARC workshops for housing, parenting, and employment. Visitations were ordered as supervised virtual visits due to the COVID-19 pandemic, to be changed to bi-weekly supervised two-hour visits in the community after the pandemic restrictions were lifted. CUA was also ordered to explore voluntarily relinquishment with Father.

On December 15, 2020, the court held a permanency review hearing. Father attended this hearing. Father was found minimally compliant with his SCP and minimal progress had been made toward alleviating the circumstances necessitating Children's placement. Mother and Father refused to disclose their current address. Father failed to sign the necessary paperwork to complete his PCE. Father also failed to attend his CEU assessment. Father did not complete his ARC programs (parenting, education, employment services, or anger management counselling). Child 2 and Child 3 were found to be diagnosed as suffering from post-traumatic stress disorder ("PTSD") and attention-deficit hyperactivity disorder ("ADHD"). Child 3 had been prescribed medication. Father was ordered to provide proof of employment or benefits received. Father was again referred to CEU for dual diagnosis assessment, monitoring, and three random drug screens. Father was also

ordered to sign the necessary paperwork for the PCE and complete the evaluation, as well as obtain a neurological evaluation. Visitation was noted as biweekly supervised visits at the agency. The court appointed TPR legal counsel for Children.

The SCP was revised on January 6, 2021. The revised SCP changed Child 2 and Child 3's permanency goals to adoption, and Child 1's alternate/concurrent goal was identified as adoption. Father's objectives included complying with all needed services and Court orders; complying with ARC for parenting, education, anger management, and employment services; attending all supervised visitation/virtual visitation with Children; complying with the BHS evaluation and recommendations; complying with anger management and domestic violence services; signing all consents and SCPs; complying with the PCE; attending the neurological appointment; and providing CUA with paystubs/proof of income.

All Children have been in DHS care since March 28, 2019. At the time of the termination and goal change hearing, Children had been in care for twenty-four months. Father has failed to comply with his objectives and comply with court orders throughout the life of the case. Father never completed the PCE, nor did he comply with ARC services, apart from housing. Father did not comply with the CEU. Father failed to regularly visit Children or provide financial assistance for them throughout their placement. Father has also failed to demonstrate he is able to safely and appropriately care for Children. Father also refused to disclose his address. DHS filed petitions to involuntarily terminate Father's parental rights and change all Children's goals to adoption on February 12, 2021. On March 26, 2021, the court held the termination and goal change trial for all Children. Father attended the trial and provided testimony. The trial court also heard testimony from the CUA Case Manager, and an additional forensic social worker. DHS requested the trial court terminate Father's rights under 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8), and (b). The trial court found clear and convincing evidence to change the Children's goals to adoption, pursuant to 42 Pa.C.S.A. §6351, and terminate Father's parental rights, pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b).

**Discussion[4]:**

On appeal of the involuntarily termination of Father's parental rights and goal change, Father asks for each Child:

1. Whether the trial court abused its discretion, when it involuntarily terminated father's rights under the Adoption Act 23 Pa.C.S.A. §2511(a)(2); §2511(a)(5) and §2511(a)(8)?
    a. Was there clear and convincing evidence to support the termination of father's parental rights under §2511(a)(2); 2511(a)(5) and §2511(a)(8)?
2. Whether the trial court abused its discretion when it terminated father's parental rights pursuant to 2511(b) which requires the trial court to find that termination would best serve the child's physical and emotional needs and welfare?
    a. Was there clear and convincing evidence to support termination under §2511(b)?
3. Whether the trial court abused its discretion, when it changed the child's goal to adoption?
    a. Was there clear and convincing evidence that changing the goal to adoption was in the child's best interest?
4. Was there clear and convincing evidence that reasonable efforts were made to reunify the family pursuant to 42 Pa.C.S.A. §6351(f)(9) prior to changing the goal to adoption?

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(2):

**(a) General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

[4] Father is discussed throughout the transcript, however testimony specifically regarding Father occurs largely from pages 13 to 29, 51 to 73, and 84 to 96. Father is also discussed on pages 35, 37-39, 42-45, 47, 49, 78-79, 107-108, and finally between pages 113 and 118. Mother also filed Notices of Appeal of the termination of her parental rights under EDAs 814, 815, 816, 817, 809, 813 of 2021. A separate opinion will be filed on Mother's appeal.

In proceedings to involuntarily terminate parental rights, the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). The clear and convincing standard means the evidence "is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa. 1989). §2511(a)(2) is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, as well as incapacity to perform those duties. *In re A.D.*, 93 A.3d 888, 895-896 (Pa. Super. 2014). Further, adequate parenting requires action, not simply intent. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (quoting *In re J.W.*, 578 A.2d 952, 959 (1990)). Parents must also make diligent efforts to resume assumption of full parental responsibilities within a reasonably prompt period. *In re A.D., supra*. This section focuses on the child's present and future need for essential parental care, control, or subsistence necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654 (Pa. Super. 1985). While there may not be an explicit list of required and specific parental duties, at minimum a child needs love, protection, guidance, and support. *In re K.Z.S.*, 946 A.2d 737, 759 (Pa. Super. 2008). A passive interest in the child is not enough; rather a parent must fulfill their obligation through affirmative performance by utilizing all available resources and exercise reasonable firmness in resisting obstacles. *Id.* Even if a parent demonstrates love for their child or makes efforts to perform their duties, if a parent's incapacity cannot be remedied within a reasonable period, their parental rights may be terminated. *In re Adoption of M.J.H., supra*.

Children have been involved with DHS since late March 2019, with the CUA Case Manager assigned in April 2019. (N.T. 03/26/21, pg. 9). Father's SCP objectives throughout the life of the case were to: attend ARC for parenting, housing, anger management, and employment; have a BHS evaluation; have a CEU assessment; and comply with visitation. (N.T. 03/26/21, pgs. 14, 67-68; DHS Exhibits 4-6). Father was aware of his objectives. (N.T. 03/26/21, pg. 13).

The CUA Case Manager testified that she could not recommend unsupervised visitation or reunification with Father due to the mental health instability Father displayed and being unsure of where his stability was at the time. (N.T. 03/26/21, pgs. 26-27). Father did avail himself for a BHS evaluation, but he failed to follow through on the evaluation's recommendations. (N.T. 03/26/21,

pgs. 18-19, 73). Father has previously reported to DHS that he had been diagnosed with bipolar disorder but did not take medication. (N.T. 03/26/21, pg. 19). The BHS evaluation diagnosed Father with unspecified neurocognitive disorder. (N.T. 03/26/21, pg. 19). Despite neurological concerns, Father did not avail himself for the recommended neurological evaluation. (N.T. 03/26/21, pg. 20). The CUA Case Manager testified that there is a two-step process where an individual needed to attend an initial Primary Care Provider ("PCP") appointment, and the neurological evaluation would be completed at a second appointment. (N.T. 03/26/21, pg. 20). The CUA Case Manager made Father an appointment with his PCP but Father did not avail himself. (N.T. 03/26/21, pg. 20). The BHS evaluation also recommended Father undergo a PCE. (N.T. 03/26/21, pgs. 55, 78). Father initially resisted undergoing a PCE but in February 2021, Father changed his mind and decided he would undergo the evaluation. (N.T. 03/26/21, pgs. 58-59, 86). The CUA Case Manager is unable to process a PCE referral without the parent's signature, so the CUA Case Manager provided Father with the paperwork he needed to sign to begin the referral process. (N.T. 03/26/21, pgs. 58-59, 78). Father alleged he never received the forms to sign for the PCE. (N.T. 03/26/21, pg. 85). By the time of the termination trial, the PCE remained outstanding since the August 8, 2019, recommendation. (N.T. 03/26/21, pgs. 58-60, 78-79, 94-95). Father alleged he attempted to schedule an intake appointment with Menergy in January or February 2021. (N.T. 03/26/21, pgs. 60-62, 87). Father did not provide CUA with any information regarding this potential treatment but maintained that Menergy had not gotten back to him about scheduling an intake, despite the CUA Case Manager experiencing the facility as being very responsive. Again, Father failed to timely engage with Menergy. Father only contacted Menergy in January or February 2021. Father has been aware of this objective since April 2019. (N.T. 03/26/21, pgs. 60-62, 87). Father did not engage in any mental health treatment throughout the life of the case. (N.T. 03/26/21, pg. 19).Father completed a CEU assessment. The assessment indicated no drug or alcohol treatment was needed. (N.T. 03/26/21, pgs. 19-20).

Father completed the housing objective through ARC, but did not engage in parenting, anger management, or employment programs. (N.T. 03/26/21, pg. 14). The CUA Case Manager testified that at the time of the termination trial there was not an active ARC referral for Father, as his most recent referral had been closed on January 23, 2021, due to nonparticipation. (N.T. 03/26/21, pg. 15). Father had another ARC referral closed on July 15, 2019, due to nonparticipation. (N.T.

03/26/21, pgs. 15-16). While Father did complete a housing program through ARC and was no longer residing in the home Children were initially removed from, Father refused to disclose his current address and so CUA could not assess the home for potential reunification. (N.T. 03/26/21, pgs. 16, 72-73). The CUA Case Manager also provided Father recommendations on where to apply for housing in both Delaware County and Montgomery County. (N.T. 03/26/21, pg. 67). CUA received confirmation from Father that he applied through Delaware County; however, Father alleges he also applied for PHA and Montgomery County. (N.T. 03/26/21, pgs. 67, 89). Father claimed Mother and him had begun looking for housing two months prior to the termination trial after CUA "gave [them] the okay to start looking. (N.T. 03/26/21, pg. 89). CUA did not testify to this claim. Father did not complete an employment program through ARC, but he did provide verification of his SSI income and provided a temporary work paystub. (N.T. 03/26/21, pgs. 17-18). Father did not disclose for what he received SSI. (N.T. 03/26/21, pg. 18). Father testified he was currently working as a utility pole inspector, but he had yet to receive a paystub. (N.T. 03/26/21, pgs. 87-88). Father alleged he provided CUA with other documents confirming his employment. (N.T. 03/26/21, pg. 88). Father also did not complete an anger management program through ARC. (N.T. 03/26/21, pgs. 14-15). The CUA Case Manager testified that Father had been oppositional, volatile, and combative in his interactions with her, including an incident where Father lunged at the Case Manager. (N.T. 03/26/21, pgs. 21, 95). The CUA Case Manager also testified she had concerns surrounding emotional abuse toward Mother. (N.T. 03/26/21, pgs. 21-22). Father claimed that CUA believes he has anger issues only because he "don't [sic] like somebody to lie on [sic] [him]." (N.T. 03/26/21, pg. 92). Father claimed CUA told him he was "snapping out". (N.T. 03/26/21, pg. 92). He also alleges that CUA did not provide medical documentation of the Children's need for glasses and their special illnesses" after he requested it. (N.T. 03/26/21, pg. 92). Father then went on to allege that an unspecified child overdosed on Klonopin while in DHS care, but provided no proof to substantiate his claim. (N.T. 03/26/21, pg. 93).

Father never graduated beyond supervised visits. (N.T. 03/26/21, pgs. 22, 62). Father's consistency with visitation throughout the life of the case was approximately 45%. (N.T. 03/26/21, pg. 24). The CUA Case Manager indicated that there had been improvement since the last court date prior to the termination trial, but as a whole his visitation was not consistent. (N.T. 03/26/21, pg. 24).

Father's behavior during visitation was described as more friendly than parental. (N.T. 03/26/21, pg. 25). His behavior was also described as oppositional. (N.T. 03/26/21, pg. 25). For instance, when the Children obtained glasses, Father's reaction was described as "they're introducing all these things that you don't even really need," rather than being glad his Children had corrected vision. (N.T. 03/26/21, pg. 25). The CUA Case Manager did not feel she was in a position to safely recommend Father obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 26). The CUA Case Manager also testified that "there really was no reason" behind Father's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Father received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). Father claimed to have only missed "a couple visits" because he was at work and was unable to take time off from work to attend the visits. (N.T. 03/26/21, pgs. 90-91). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits in their place, when parents are noncompliant; the Case Manager for this family had to continue personally supervising visits until two weeks prior to the termination trial due to Father's non-compliance. (N.T. 03/26/21, pg. 96).

Throughout the life of the case, Father has been minimally to moderately compliant with his SCP objectives. Father has failed to successfully complete all his SCP objectives. Children received trauma therapy at Children's Crisis Treatment Center ("CCTC"), but Father has not inquired about their services. Father did attend a meeting to discuss medication for Child 2, but refused to sign consent forms for the medication. (N.T. 03/26/21, pgs. 37-38, 42-22). When the Children came into DHS care, they were behind in medical and dental care. Children were also not enrolled in school. (N.T. 03/26/21, pg. 11). Their foster parent has ensured that the Children are up to date on their medical and dental needs, including having them enroll in school with Individual Education Plans ("IEPs"). (N.T. 03/26/21, pgs. 40-41, 47-48, 50). Father must fulfill his parenting duties through affirmative performance of participating in his Children's present and future needs necessary for their physical and mental well-being. (N.T. 03/26/21, pgs. 79-80). Father attended only two court hearings during the two-years prior to the termination trial. The conditions and causes of Father's incapacity have not and will not be remedied by Father within a reasonable period of time. Children were adjudicated dependent on April 9, 2019. Children had been in DHS

care for nearly twenty-four months at the time of the termination trial on March 26, 2021. Father was inconsistent with his attendance at court hearings but was aware of his SCP objectives. Father had ample time, opportunity, and was offered assistance to put himself in a position to adequately parent and care for Children, but his repeated and continued incapacity has not been mitigated. Father is unable to meet Children's basic needs. The testimony of the CUA Case Manager was credible. Father has demonstrated an unwillingness to work to improve and remedy the causes of his incapacity to parent in order to provide Children with the essential parental care, control, and subsistence necessary for their physical and mental well-being. Termination under 23 Pa.C.S.A. §2511(a)(2) was proper.

Father also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 501, 508 (Pa. Super. 2004).

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since their adjudication on April 9, 2019. Father's SCP objectives included attending ARC for housing, employment, parenting, and anger management classes, avail himself for a BHS evaluation and comply with recommendations, obtain a CEU assessment, and comply with visitation. (N.T. 03/26/21, pgs. 14, 68-68; DHS Exhibits 4-6). Father had multiple ARC

referrals closed for nonparticipation, as recently as January 2021. (N.T. 03/26/21, pgs. 15-16). Father completed the housing objective through ARC, but did not engage in parenting, anger management, or employment programs. (N.T. 03/26/21, pg. 14). Father was no longer residing in the home Children were initially removed from, but refused to disclose his current address. (N.T. 03/26/21, pgs. 16, 72-73). The CUA Case Manager also provided Father recommendations on where to apply for housing in both Delaware County and Montgomery County. (N.T. 03/26/21, pg. 67). CUA testified to receiving confirmation from Father that he applied through Delaware County, however Father alleges he also applied for PHA and Montgomery County. (N.T. 03/26/21, pgs. 67, 89). Father claimed he and Mother had begun looking for housing two months prior to the termination trial after CUA "gave [them] the okay to start looking. (N.T. 03/26/21, pg. 89). Father did not complete an employment program through ARC, but he did provide verification of his SSI income and provided a temporary work paystub. (N.T. 03/26/21, pgs. 17-18). Father did not disclose for what he received SSI. (N.T. 03/26/21, pg. 18). Father testified he was currently working as a utility pole inspector, but he had yet to receive a paystub. (N.T. 03/26/21, pgs. 87-88). Father alleged he provided CUA with other documents confirming his employment, but CUA did not testify to this information. (N.T. 03/26/21, pg. 88). Father also did not complete an anger management program through Menergy or ARC. (N.T. 03/26/21, pgs. 14-15). Father failed to timely engage with Menergy. Father only contacted Menergy in January or February of 2021. Father has been aware of this objective since April 2019. (N.T. 03/26/21, pgs. 60-62, 87). The CUA Case Manager reported that Father had been oppositional, volatile, and combative in his interactions with her, including an incident where Father lunged at the Case Manager. (N.T. 03/26/21, pgs. 21, 95). The CUA Case Manager also testified she had concerns surrounding emotional abuse toward Mother. (N.T. 03/26/21, pgs. 21-22). Father did not complete a parenting program through ARC. (N.T. 03/26/21, pg. 14). Father completed a CEU assessment. (N.T. 03/26/21, pgs. 19-20). The assessment indicated no drug or alcohol treatment was needed. (N.T. 03/26/21, pgs. 19-20). While Father did complete a BHS evaluation in August 2019, he failed to follow through on the evaluation's recommendations. (N.T. 03/26/21, pgs. 18-19, 73). The CUA Case Manager is unable to process a PCE referral if Father does not avail for signing appropriate consent forms. Father alleged he never received the consent forms for his signature; however, Father was against a PCE for a long period of time. The record established that the PCE remained

outstanding since the August 8, 2019 recommendation, due to Father's delay and lack of agreement to sign the consent forms. (N.T. 03/26/21, pgs. 18-19, 58-60, 78-79, 94-95). The BHS evaluation also recommended a neurological evaluation, but Father did not comply with this recommendation either. (N.T. 03/26/21, pg. 20). The CUA Case Manager testified that there was a two-step process where an individual needed to attend a PCP appointment, and then at a second appointment the neurological evaluation would be completed. (N.T. 03/26/21, pg. 20). The CUA Case Manager made Father an appointment with his PCP but Father did not avail himself. (N.T. 03/26/21, pg. 20). Father never graduated beyond supervised visits. (N.T. 03/26/21, pgs. 22, 62). Father's consistency with visitation was approximately 45%. (N.T. 03/26/21, pg. 24). The CUA Case Manager indicated that there had been improvement since the last court date prior to the termination trial, but as a whole his visitation was not consistent. (N.T. 03/26/21, pgs. 24). Father's behavior during visitation was described as more friendly than parental. (N.T. 03/26/21, pg. 25). His behavior was also described as oppositional. (N.T. 03/26/21, pg. 25). For instance, when the Children obtained glasses, Father's reaction was described as "they're introducing all these things that you don't even really need," rather than being glad his Children had corrected vision. (N.T. 03/26/21, pg. 25). The CUA Case Manager did not feel she was in a position to safely recommend Father obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 26). The CUA Case Manager also testified that "there really was no reason" behind Father's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Father received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). Father claimed to have only missed "a couple visits" because he was at work and was unable to take time off from work to attend the visits. (N.T. 03/26/21, pgs. 90-91). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits, when parents are noncompliant; the Case Manager for this family had to continue personally supervising visits until two weeks prior to the termination trial due to Father's noncompliance. (N.T. 03/26/21, pg. 96). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Father's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). The CUA Case Manager has made reasonable efforts to assist Father in obtaining proper

services to help him parent and be reunified with his Children. As a result of Father's noncompliance and lack of a healthy parental bond with Children, the trial court found that termination of Father's parental rights was in the best interest of Children for their overall well-being. (N.T. 03/26/21, pgs. 113-117). Father is unable or unwilling to remedy the conditions that led to Children's placement and termination best serves their needs and welfare. Father did not successfully complete all his SCP objectives within a reasonable period of time. Children's lives cannot be put on hold, in the hope that Father will summon the ability to handle the responsibilities of parenting. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(5) was proper.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security, and stability. *In re Bowman*, 647 A.2d 217, 219 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since their adjudication on April 9, 2019. Father's SCP objectives included attending ARC for housing, employment, parenting, and anger management classes, avail himself for a BHS evaluation and comply with recommendations, obtain a CEU assessment, and comply with visitation. (N.T. 03/26/21, pgs.14, 67-68; DHS Exhibits 4-6). Father had multiple ARC

referrals closed for nonparticipation, as recently as January 2021. (N.T. 03/26/21, pgs. 15-16). Father completed the housing objective through ARC, but did not engage in parenting, anger management, or employment programs. (N.T. 03/26/21, pg. 14). Father was no longer residing in the home Children were initially removed from, but refused to disclose his current address. (N.T. 03/26/21, pgs. 16, 72-73). The CUA Case Manager also provided Father recommendations on where to apply for housing in both Delaware County and Montgomery County. (N.T. 03/26/21, pg. 67). The CUA Case Manager testified to receiving confirmation from Father that he applied through Delaware County; however, Father alleges he also applied for PHA and Montgomery County. (N.T. 03/26/21, pgs. 67, 89). Father claimed he and Mother had begun looking for housing two months prior to the termination trial after CUA "gave [them] the okay to start looking. (N.T. 03/26/21, pg. 89). CUA did not testify to this assertion. Father did not complete an employment program through ARC, but he did provide verification of his SSI income and provided a temporary work paystub. (N.T. 03/26/21, pgs. 17-18). Father did not disclose for what he received SSI. (N.T. 03/26/21, pg. 18). Father testified he was currently working as a utility pole inspector, but he had yet to receive a paystub. (N.T. 03/26/21, pgs. 87-88). Father alleged he provided CUA with other documents confirming his employment, but the CUA Case Manager did not confirm this information. (N.T. 03/26/21, pg. 88). Father also did not complete an anger management program through Menergy or ARC. (N.T. 03/26/21, pgs. 14-15). Father only started to contact Menergy in January or February of 2021. Father was aware of this objective since April 2019. (N.T. 03/26/21, pgs. 60-62, 87). The CUA Case Manager reported that Father had been oppositional, volatile, and combative in his interactions with her, including an incident where Father lunged at the Case Manager. (N.T. 03/26/21, pgs. 21, 95). The CUA Case Manager also testified she had concerns surrounding emotional abuse toward Mother. (N.T. 03/26/21, pgs. 21-22). Father did not complete a parenting program through ARC. (N.T. 03/26/21, pg. 14). Father completed a CEU assessment. (N.T. 03/26/21, pgs. 19-20). The assessment indicated no drug or alcohol treatment was needed. (N.T. 03/26/21, pgs. 19-20). While Father did complete a BHS evaluation in August 2019, he failed to follow through on the evaluation's recommendations. (N.T. 03/26/21, pgs. 18-19, 73). The PCE remained outstanding due to Father's failure to timely agree to avail himself to sign consent forms. (N.T. 03/26/21, pgs. 18-19, 58-60, 73, 78-79, 94-95). The BHS evaluation also recommended a neurological evaluation, but Father did not comply with this recommendation

either. (N.T. 03/26/21, pg. 20). The CUA Case Manager testified that there was a two-step process where an individual needed to attend a PCP appointment, and then at a second appointment the neurological evaluation would be completed. (N.T. 03/26/21, pg. 20). The CUA Case Manager made Father an appointment with his PCP but Father did not avail himself. (N.T. 03/26/21, pg. 20). Father never graduated beyond supervised visits. (N.T. 03/26/21, pgs. 22, 62). Father's consistency with visitation was approximately 45%. (N.T. 03/26/21, pg. 24). The CUA Case Manager indicated that there had been improvement since the last court date prior to the termination trial, but as a whole his visitation was not consistent. (N.T. 03/26/21, pg. 24). Father's behavior during visitation was described as more friendly than parental. (N.T. 03/26/21, pg. 25). His behavior was also described as oppositional. (N.T. 03/26/21, pg. 25). For instance, when the Children obtained glasses, Father's reaction was described as "they're introducing all these things that you don't even really need," rather than being glad his Children had corrected vision. (N.T. 03/26/21, pg. 25). The CUA Case Manager did not feel she was in a position to safely recommend Father obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 26). The CUA Case Manager also testified that "there really was no reason" behind Father's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Father received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). Father claimed to have only missed "a couple visits" because he was at work and was unable to take time off from work to attend the visits. (N.T. 03/26/21, pgs. 90-91). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits, when parents are noncompliant. The CUA Case Manager had to continue personally supervising visits until two weeks prior to the termination trial due to Father's noncompliance. (N.T. 03/26/21, pg. 96). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Father's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). The CUA Case Manager has made reasonable efforts to assist Father in obtaining proper services to help him parent and be reunified with his Children. Children received trauma therapy at Children's Crisis Treatment Center ("CCTC"), but Father has not inquired about their services. Father did attend a meeting to discuss medication for Child 2, but refused to sign consent forms

for the medication. (N.T. 03/26/21, pgs. 37-38, 42-22). When the Children came into DHS care, they were behind in medical and dental care. Children were also not enrolled in school. (N.T. 03/26/21, pg. 11). Their foster parent has ensured that the Children are up to date on their medical and dental needs, including having them enroll in school with Individual Education Plans ("IEPs"). (N.T. 03/26/21, pgs. 40-41, 47-48, 50). Father must fulfill his parenting duties through affirmative performance of participating in his Children's present and future needs necessary for their physical and mental well-being. (N.T. 03/26/21, pgs. 79-80). As a result of Father's noncompliance and lack of a healthy parental bond with Children, the trial court found that termination of Father's parental rights was in the best interest of Children for their overall well-being. (N.T. 03/26/21, pgs. 113-117). Father is unable or unwilling to remedy the conditions that led to Children's placement and termination best serves their needs and welfare. Father did not successfully complete all his SCP objectives within a reasonable period of time. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(8) was proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.,* 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.,* 946 A.2d 753, 762-763 (Pa. Super. 2008). The trial court must determine that the bond between a parent and a child cannot be in only one direction. There must be a bilateral relationship that roots from a parent's willingness to learn appropriate parenting skills and ability to provide stability to the child. *In re K.K.R.-S.,* 958 A.2d 529, 534 (Pa. Super. 2008). Additionally, a bond is not just a positive relationship between a child and a parent. Being a parent means assuming responsibility so that a real bond develops, not just a casual relationship. Children have the ability to know, love, and sometimes have an enjoyable time with a parent that have little to do with their upbringing. *In re J.L.C.,* 837 A.2d 1247, 1249 (Pa. Super. 2003). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the

circumstances of the particular case. _Id_. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, or medical care, if found to be beyond the control of the parent. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father has not been consistently compliant with visitation and never graduated beyond biweekly supervised visits. (N.T. 03/26/21, pgs. 22, 62). Father's consistency with visitation was approximately 45%. (N.T. 03/26/21, pg. 24). The CUA Case Manager indicated that there had been improvement since the last court date prior to the termination trial, but as a whole his visitation was not consistent. (N.T. 03/26/21, pg. 24). Father's behavior during visitation was described as more friendly than parental. (N.T. 03/26/21, pg. 25). His behavior was also described as oppositional. (N.T. 03/26/21, pg. 25). The CUA Case Manager did not feel she was in a position to safely recommend Father obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 26). The CUA Case Manager also testified that "there really was no reason" behind Father's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Father received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). Father claimed to have only missed "a couple visits" because he was at work and was unable to take time off from work to attend the visits. (N.T. 03/26/21, pgs. 90-91). The CUA Case Manager testified that CUA has a policy where the Case Manager takes over supervision, rather than having other staff supervise visits, when parents are noncompliant The CUA Case Manager had to continue personally supervising visits until two weeks prior to the termination trial due to Father's noncompliance. (N.T. 03/26/21, pg. 96). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Father's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). The CUA Case Manager testified that none of the three Children would suffer permanent or irreparable harm if Father's parental rights were terminated. (N.T. 03/26/21, pgs. 39, 45, 49). None of the Children had emotional reactions when visits ended and their relationships with Father showed a lack of connection. (N.T. 03/26/21, pgs. 39, 44-45, 49). Instead at the end of the last visit, all Children ran to their foster mother's car. (N.T. 03/26/21, pg. 49). The

CUA Case Manager testified that Children had developed healthy and parental bonds with their foster parents. (N.T. 03/26/21, pgs. 39, 45, 49). Child 1 receives developmental support services through Elwyn and trauma therapy through CCTC. (N.T. 03/26/21, pg. 37). Father does not engage in these services, nor ask about them. (N.T. 03/26/21, pgs. 37-38). Child 1 knows that Father is his biological Father, but the CUA Case Manager would not describe their relationship as a parent/child relationship. (N.T. 03/26/21, pg. 38). Child 2 has an IEP and also receives trauma therapy through CCTC. (N.T. 03/26/21, pgs. 41-42). Child 2 needed medication and Father came to the medication management meeting late. (N.T. 03/26/21, pg. 42). At this meeting, Father refused to permit Child 2 to receive the recommended medication, and stated that medication had done "something to his body and he doesn't want that for his children." (N.T. 03/26/21, pgs. 43-44). Apart from attendance at the medication management meeting, Father has not participated in any other aspect of Child 2's services. Child 3 also has an IEP and receives trauma therapy through CCTC. (N.T. 03/26/21, pg. 47). Father does not engage with Child 3's services either. (N.T. 03/26/21, pg. 47). Father did not request access to the Children's virtual services despite being aware of all services. (N.T. 03/26/21, pgs. 65, 79). Father never verbally expressed to the CUA Case Manager that he wanted his sons back. (N.T. 03/26/21, pgs. 68-69). The CUA Case Manager testified that the Children have made "extraordinary" progress in their foster home. (N.T. 03/26/21, pg. 50). The CUA Case Manager testified that upon first meeting the Children, Child 3 in particular was unable to form full sentences and she mistakenly believed him to be on the autism spectrum. (N.T. 03/26/21, pg. 50). Now, Child 3 is able to have conversations with the CUA Case Manager. (N.T. 03/26/21, pg. 50). When Children's TPR legal counsel spoke with Children, Child 3 reportedly stated: "I don't miss my parents anymore." (N.T. 03/26/21, pg. 98). The forensic social worker testified that all Children reported wanting to remain with their "Mom-mom," which is how they refer to their foster mother. (N.T. 03/26/21, pgs. 45-46, 101). Children also look to their foster mother to meet their needs and the parental bond is between Children and their foster mother, rather than with Father. (N.T. 03/26/21, pg. 100). The CUA Case Manager testified that Children cannot be safely returned to Father. (N.T. 03/26/21, pg. 26). Children have been in foster care placement for approximately twenty-four months and the trial court found that the parental bond is between Children and foster parents, not between Children and Father. (N.T. 03/26/21, pg. 117). Father has not created a healthy parental bond between himself and Children. (N.T. 03/26/21, pg.

117). Because there is no healthy or beneficial bond to preserve, it is in Children's best interests to terminate Father's parental rights and free them for adoption. (N.T. 03/26/21, pg. 117). The record establishes by clear and convincing evidence that termination would not severe an existing bond and beneficial relationship with Father. Father is unable to provide stability and safety to Children, and does not have a parental bond with any of the Children. Father was inconsistent and often noncompliant with his visitation. The trial court's termination of Father's parental rights to Children under 23 Pa.C.S.A. §2511(b) was proper.

Father also asserts that the court erred in changing Child's permanency goal from reunification to adoption. Pursuant to 42 Pa.C.S.A. §6351, when considering a petition to change a dependent child's goal, the trial court must consider, *inter alia*:

> (1) the continuing necessity for and appropriate of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal of the child; (5) a likely date by which the goal might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty two months.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011). In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873, 877 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*. 957 A.2d 1205, 1220 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670, 681 (Pa. Super. 2001). A child's life cannot be put on hold in the hope that parent will someday summon the ability to handle and assume the responsibilities of being a parent. *In re A.B.*, 19 A.3d at 1089. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Children had been in DHS care for nearly twenty-four months at the time of the termination trial on March 26, 2021, since their adjudication on April 9, 2019. Father's SCP objectives included attending ARC for housing, employment, parenting, and anger management classes, avail himself for a BHS evaluation and comply with recommendations, obtain a CEU assessment, and comply with visitation. (N.T. 03/26/21, pgs. 14, 67-68; DHS Exhibits 4-6). Father had multiple ARC referrals closed for nonparticipation, as recently as January 2021. (N.T. 03/26/21, pgs. 15-16). Father completed the housing objective through ARC, but did not engage in parenting, anger management, or employment programs. (N.T. 03/26/21, pgs. 14). Father was no longer residing in the home Children were initially removed from, but refused to disclose his current address and so CUA could not assess the home for safety. (N.T. 03/26/21, pgs. 16, 72-73). The living conditions were a key factor in the removal of Children from parents' care, and Father refused to provide CUA with any information regarding his current housing situation. (N.T. 03/26/21, pgs. 10, 72-73). The CUA Case Manager also provided Father recommendations on where to apply for housing in both Delaware County and Montgomery County. (N.T. 03/26/21, pg. 67). The CUA Case Manager testified to receiving confirmation from Father that he applied through Delaware County; however, Father alleges he also applied for PHA and Montgomery County. (N.T. 03/26/21, pgs. 67, 89). Father claimed he and Mother had begun looking for housing two months prior to the termination trial after CUA "gave [them] the okay to start looking. (N.T. 03/26/21, pg. 89). The CUA Case Manager did not testify to this claim. Father did not complete an employment program through ARC, but he did provide verification of his SSI income and provided a temporary work paystub. (N.T. 03/26/21, pgs. 17-18). Father did not disclose for what he received SSI. (N.T. 03/26/21, pg. 18). Father testified he was currently working as a utility pole inspector, but he had yet to receive a paystub. (N.T. 03/26/21, pgs. 87-88). Father alleged he provided CUA with other confirmation of his employment, but the CUA Case Manager did not confirm this information. (N.T. 03/26/21, pg. 88). Father also did not complete an anger management program through Menergy or ARC. (N.T. 03/26/21, pgs. 14-15). Father did not attempt to engage Menergy until January or February of 2021. (N.T. 03/26/21, pgs. 60-62, 87). The CUA Case Manager reported that Father had been oppositional, volatile, and combative in his interactions with her, including an incident where Father lunged at the Case Manager. (N.T. 03/26/21, pgs. 21, 96). The CUA Case Manager also testified she had concerns surrounding emotional abuse toward Mother. (N.T.

03/26/21, pgs. 21-22). Father did not complete a parenting program through ARC. (N.T. 03/26/21, pg. 14). Father completed a CEU assessment. (N.T. 03/26/21, pgs. 19-20). The assessment indicated no drug or alcohol treatment was needed. (N.T. 03/26/21, pgs. 19-20). While Father did complete a BHS evaluation in August 2019, he failed to follow through on the evaluation's recommendations. (N.T. 03/26/21, pgs. 18-19, 73). The CUA Case Manager is unable to process a PCE referral if Father does not avail for signing appropriate consent forms. Father alleged he never received the consent forms for his signature; however, Father was against a PCE for a long period of time. The record established that the PCE remained outstanding since the August 8, 2019 recommendation, due to Father's delay and lack of agreement to sign the consent forms. (N.T. 03/26/21, pgs. 18-19, 58-60, 78-79, 94-95). The BHS evaluation also recommended a neurological evaluation, but Father did not comply with this recommendation either. (N.T. 03/26/21, pg. 20). The CUA Case Manager testified that there was a two-step process where an individual needed to attend a PCP appointment, and then at a second appointment the neurological evaluation would be completed. (N.T. 03/26/21, pg. 20). The CUA Case Manager made Father an appointment with his PCP but Father did not avail himself. (N.T. 03/26/21, pg. 20). Father never graduated beyond supervised visits. (N.T. 03/26/21, pgs. 22, 62). Father's consistency with visitation was approximately 45%. (N.T. 03/26/21, pg. 24). The CUA Case Manager indicated that there had been improvement since the last court date prior to the termination trial, but as a whole his visitation was not consistent. (N.T. 03/26/21, pg. 24). Father's behavior during visitation was described as more friendly than parental. (N.T. 03/26/21, pg. 25). His behavior was also described as oppositional with respect to DHS and CUA. (N.T. 03/26/21, pg. 25). The CUA Case Manager also testified that "there really was no reason" behind Father's inconsistency in visitation. (N.T. 03/26/21, pg. 96). Father received public transportation tokens and passes prior to the COVID-19 pandemic, but remained inconsistent with both in-person and virtual visitation until approximately two weeks prior to the termination trial. (N.T. 03/26/21, pg. 96). Father claimed to have only missed "a couple visits" because he was at work and was unable to take time off from work to attend the visits. (N.T. 03/26/21, pgs. 90-91). Father never expressed to the CUA Case Manager that he wanted his sons back. (N.T. 03/26/21, pgs. 68-69). The CUA Case Manager testified that the Children have made "extraordinary" progress in their foster home. (N.T. 03/26/21, pg. 50). The CUA Case Manager testified that upon first meeting the Children, Child 3 in particular was

unable to form full sentences and she mistakenly believed him to be on the autism spectrum. (N.T. 03/26/21, pg. 50). Now, Child 3 is able to have conversations with the CUA Case Manager. (N.T. 03/26/21, pg. 50). When Children's TPR legal counsel spoke with Children, Child 3 reportedly stated: "I don't miss my parents anymore." (N.T. 03/26/21, pg. 98). The forensic social worker testified that all Children reported wanting to remain with their "Mom-mom," which is how they refer to their foster mother. (N.T. 03/26/21, pgs. 45-46, 101). Children also look to their foster mother to meet their needs and the parental bond is between Children and their foster mother, rather than with Father. (N.T. 03/26/21, pg. 101). The CUA Case Manager testified that Children cannot be safely returned to Father. (N.T. 03/26/21, pg. 26). Children have been in foster care placement for approximately twenty-four months, and the trial court found that the parental bond is between Children and foster parents, not between Children and Father. (N.T. 03/26/21, pg. 117). Father has not created a healthy parental bond between himself and Children. (N.T. 03/26/21, pg. 117). After a conversation about voluntarily relinquishment of parental rights, the CUA Case Manager observed an improvement in Father's compliance, but this did not occur until approximately twenty-two months into the life of the case. (N.T. 03/26/21, pg. 30). The CUA Case Manager did not feel she was in a position to safely recommend Father obtain unsupervised visitation or reunification with Children. (N.T. 03/26/21, pg. 26). Children are in a safe and stable environment and have formed a positive and beneficial bond with their "Mom-mom." They have made substantial improvement in the twenty-four months they have been in her care. Children need permanency, which Father cannot provide nor has Father taken concrete steps to provide in the future. The record established by clear and convincing evidence that the Children would not suffer any irreparable harm as a result of the goal change. The trial court's change of permanency goal from reunification to adoption was proper and should be affirmed.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights to Children pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8) and (b); and changing each Child's goal from reunification to adoption pursuant to 42 Pa.C.S.A. §6351. The trial court's termination of Father's parental rights

and changing of each Child's goal was proper and should be affirmed.

By the court,

_____

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of D.D.M., a Minor | : | CP-51-DP-0000527-2019 |
| | : | CP-51-AP-0000075-2021 |
| In Interest of D.R.M., a Minor | : | CP-51-DP-0000528-2019 |
| | : | CP-51-AP-0000076-2021 |
| In the Interest of D.S.M., a Minor | : | CP-51-DP-0000529-2019 |
| | : | CP-51-AP-0000077-2021 |
| | : | |
| | : | FID: 51-FN-000528-2019 |
| | : | |
| APPEAL OF: D.M., Father | : | 752 EDA 2021 |
| | : | 753 EDA 2021 |
| | : | 757 EDA 2021 |
| | : | 755 EDA 2021 |
| | : | 762 EDA 2021 |
| | : | 760 EDA 2021 |

## CERTIFICATE OF SERVICE

I hereby certify that this court is serving a copy of this duly executed Opinion upon all parties or their counsel on <u>May 20, 2021</u>. The names and addresses of all persons served are as follows:

A.Bennette Harrison, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102
a.bennette.harrison@phila.gov

Lisa Visco, Esq.
206 N 22nd Street, Unit B
Philadelphia, Pennsylvania 19103
viscolaw@gmail.com

Deborah Fegan, Esq.
1800 JFK Blvd, Suite 300
Philadelphia, Pennsylvania, 19103
dafegan@aol.com

Lawrence O'Connor, Esq.
2301 Cherry Street, Suite 6A
Philadelphia, Pennsylvania, 19103-1061
larry@oconnoresq.com

Terry Blynn, Esq.
30 S 15th Street, 15th Floor
Philadelphia, Pennsylvania 19102
Tblynn4170@gmail.com

BY: _____
Sabine A. Glocker, Esq.
Law Clerk to the Hon. Joseph L. Fernandes
First Judicial District of Pennsylvania
T: (215) 686-2660 | sabine.glocker@courts.phila.gov

Page 1 of 1